Joseph B. GRIGGS, Appellant,

v.

CAPITOL MACHINE WORKS, INC., an Active Texas Corporation, Appellee.

No. 14183.

Court of Appeals of Texas, Austin.

Jan. 16, 1985.

Rehearing Denied May 15, 1985.

Stephen G. Nagle, David Nagle & Associates, P.C., Austin, for appellant.

Ronald D. Wamsted, Brown, Maroney, Rose, Barber & Dye, Austin, for appellee.

Before POWERS, KEITH * and GAMMAGE, JJ.

POWERS, Justice.

Joseph B. Griggs, appellant, prays that we reverse a summary judgment rendered against him in his suit against appellee, Capitol Machine Works, Inc., a corporation organized and existing under the laws of the State of Texas. The judgment orders that appellant take nothing by his suit against appellee for personal injuries. We will affirm the judgment.

## THE CONTROVERSY

### The Parties' Pleadings

In appellant's first amended original petition, upon which judgment was rendered below, he alleged that he was injured on or about July 16, 1982 while using a product manufactured by "Capitol Machine Works, Inc.," a corporation having the same name as appellee but one that had voluntarily dissolved in October 1979 after manufac-

* Keith, Justice (Retired), Ninth Court of Appeals, sitting by assignment. See Art. 1812, [as amended].

turing and selling the particular article that allegedly caused appellant's injury. We shall hereinafter refer to this corporation as the "dissolved corporation." It is not a party to this appeal.

Appellant sued both appellee and the dissolved corporation. Appellant's pleading sets forth four distinct causes of action, three against the dissolved corporation and one against appellee. Appellant averred that the dissolved corporation was liable to him because: (1) it had manufactured the product which was "unreasonably dangerous" and the cause of his injuries; (2) it "was negligent in the design and manufacture of the product," which negligence was the proximate cause of his injuries; and (3) it warranted that the product "was suitable for the purpose for which it was intended," the product was not so suitable, and the "lack of suitability led to" appellant's injuries. Against appellee, appellant alleged a *single* theory and cause of action expressed in the following words:

> [Appellee] purchased not only the assets, but the going business from defendant dissolved corporation, and *therefore succeeded to the liabilities of the dissolved corporation, including any liability arising in this case.*

(emphasis added).

It cannot be doubted that the liability asserted against appellee is vicarious only; that is to say, appellant's claim against appellee is not based upon any act or omission *by appellee,* but upon a theory that the law *imputes* to appellee a liability based upon an act or omission of the dissolved corporation. The foundation upon which appellant would base this imputation of liability presents a question of law only: Did appellee's *mere purchase of the assets and going business* of the dissolved corporation impose upon appellee, as a matter of law, any liability for appellant's injuries? (It is not contended by appellant that appellee is otherwise liable, as by a contract between appellee and the dissolved corporation whereunder the former agreed to assume such liability intending to benefit appellant or other third parties.) Appellee

appeared and answered in the cause by general denial.

## Appellee's Motion for Summary Judgment

About six weeks after its appearance, appellee moved for summary judgment, alleging that it was entitled to judgment as a matter of law because the summary-judgment record showed no genuine issue of any "real fact." The ground specified was that under the summary-judgment record it was undisputed that appellee had neither manufactured nor sold the product that had allegedly been the cause of appellant's injuries. An affidavit accompanied the motion for summary judgment. It was executed by an organizer and sole shareholder of the appellee corporation. Only a few portions of it are applicable to the issue of whether summary judgment was properly granted. In all material respects the terms of the affidavit agree with appellant's allegations: (1) the dissolved corporation, and not appellee, had manufactured and sold the particular article that had caused appellant's injuries; (2) that corporation had dissolved after such sale; and (3) appellee had purchased the assets and "going business" of the dissolved corporation. We therefore regard as surplusage those parts of the affidavit which aver that appellee had not contractually assumed any liability of the dissolved corporation, and that the shareholders and officers of the two corporations were different, for these have no bearing on the single theory of liability set forth in appellant's first amended original petition—the single theory upon which summary judgment was rendered.

There is between the parties, therefore, no controverted issue of any *material* fact, for they *agree* upon those facts necessary to decide, as a matter of law, appellant's allegation that appellee is liable to him solely by reason of purchasing the assets and going business of the dissolved corporation, the legal entity that actually manufactured and sold the specific article that allegedly caused appellant's injuries—a

theory said by appellant to be a novel one in this jurisdiction.

The trial court granted appellee's motion for summary judgment and severed appellant's remaining claims against the dissolved corporation, also a defendant in the cause but not a party to this appeal. This appeal ensued.

## HOLDINGS AND DISCUSSION

Appellant brings to this Court two points of error that we shall discuss in order. We turn first to his "products liability" claim.

### The Theory of Imputed Strict Liability

Appellant's pleaded cause of action against appellee is facially susceptible of an interpretation that would include a theory that appellee succeeded to *all* liabilities of the dissolved corporation, whether for debt, negligence, or breach of contract, including breach of a warranty of fitness.[1] However, appellant's brief under his first point of error limits and links his contention of imputed liability solely to recovery for personal injuries based upon the theory of "products liability." Appellee's theory finds support in some jurisdictions, as pointed out below.[2]

We turn then to the basic issue: Does the common law affirmatively impose upon a corporation strict liability for personal injuries caused by an unreasonably dangerous product manufactured and sold by an-

1. Appellee does not allege any *theory* by which appellant could be held liable for the *general* obligations of the dissolved corporation, that is: (a) by an express or implied agreement in that regard, for the benefit of the creditors of the dissolved corporation, including those injured by a tort of the dissolved corporation; (b) by reason of the fact that the sale of corporate assets is tantamount to a consolidation or merger of the two corporate entities, or a mere continuation or reincarnation of the original corporation; or (c) by reason of the fact that the transaction was a fraudulent endeavor by the original corporation to escape liability. *See Western Resources Life Ins. Co. v. Gerhardt*, 553 S.W.2d 783 (Tex.Civ.App.1977, writ ref'd n.r.e.). Portions of appellant's brief suggest that had more "discovery" been conducted in the trial court, preceding the hearing on appellee's motion for summary judgment, perhaps matters might have been learned by him that would have enabled him to allege one or more of the theories briefly noted in the foregoing paragraph. We observe from the record, however, that some six weeks passed after appellee appeared and answered in the cause, during which appellant chose not to conduct any discovery, or so it appears from the record. Nor does the record reflect that appellant sought a postponement of the hearing date specified in appellee's motion for summary judgment. Nor does it reflect that appellant requested leave of court to file subsequent to that hearing, and before the court ruled on the motion for summary judgment, any information obtained through belated discovery. *See* Tex.R.Civ.P.Ann. 166–A, §§ (c), (e), (f) (1976 & Supp.1984).

2. Appellant's first point of error raises two different arguments. Appellant first contends that the summary judgment was erroneous because Tex.Bus.Corp.Act Ann. art. 5.10 (1980) "does not bar a personal injury lawsuit against the corpo-

rate successor who purchased a going business and all assets from a defunct corporate manufacturer of a defective product." That statute provides as follows:

> \* \* \* \* \* \*
>
> A disposition of all, or substantially all, of the property and assets of a corporation requiring the special authorization of the shareholders of the corporation ...:
>
> \* \* \* \* \* \*
>
> (2) Except as otherwise expressly provided by another statute, does not make the acquiring corporation responsible or liable for any liability or obligation of the selling corporation that the acquiring corporation did not expressly assume.

We shall, for purposes of the appeal, and without purporting to decide the matter, assume with appellant that the statute does not apply to the present case *so as to bar* his claim against appellant for money damages arising from his alleged injuries. Our assumption is based upon its being favorable to appellant, of course, but also upon the additional ground that it is undisputed in the present case that appellee, a corporation, was not the immediate purchaser from the dissolved corporation. Instead, the sole shareholder of appellee, a natural person, was the immediate purchaser. While this raises a question as to the applicability of the statute, it is not necessary to decide the question because we disagree with appellant's basic theory of imputed liability, the other argument raised in his first point of error. Therefore, *assuming* no statutory bar to appellant's action, the bulk of this opinion is devoted to whether the *common law affirmatively assigns* to a "successor corporation," defined as one that purchases the assets and going business of another corporation, strict liability for personal injury caused by unreasonably dangerous products manufactured and sold by the latter.

other corporation, when the former has purchased all the assets and going business of the latter and continues to make and supply the same product line as that which includes the unreasonably dangerous product? (We assume that appellee did, indeed, continue the "product line," a point not established either way in the summary-judgment record.)

Appellant's theory of imputed liability, the "products line" theory, finds varying degrees of support in the highest courts of some jurisdictions. *Ray v. Alad Corp.*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977); *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811 (1981); *Dawejko v. Jorgensen Steel Co.*, 290 Pa.Super. 15, 434 A.2d 106 (1981); *Tift v. Forage King Industries Inc.*, 108 Wis.2d 72, 322 N.W.2d 14 (1982); *Rivers v. Stihl*, 434 So.2d 766 (Ala.1983). The theory was stated as follows in *Ramirez v. Amsted Industries, Inc., supra:*

> [W]here one corporation acquires all or substantially all the manufacturing assets of another ... and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor. The social policies underlying strict products liability in New Jersey are best served by extending strict liability to a successor corporation that acquires the business assets and continues to manufacture essentially the same line of product as its predecessor, particularly where the successor corporation benefits from trading its product line on the name of the predecessor and takes advantage from its accumulated good will, business reputation and established customers.

431 A.2d at 825. The "social policies" underlying strict liability for unreasonably dangerous products may be summarized generally as follows:

> The purpose behind such policy has been to insure that the costs of injuries resulting from defective products are borne, as a cost of doing business, by the persons who put the products into the channels of commerce rather than by the injured persons who ordinarily are powerless to protect themselves, without imposing upon such persons the problems inherent in pursuing negligence remedies. As otherwise stated, this policy involves the placing of liability on the party primarily responsible, who is in a position to most effectively reduce the hazards to life and health arising from their products, and the securing of an adequate remedy for the injured plaintiff. The imposition of strict liability involves the task of balancing between the need for adequate recovery for the person injured and the need for viable enterprise, and weighing the means available for avoiding the risk of harm against the utility of the product.

72 C.J.S. Supplement Products Liability § 7, 10–11 (1975).

How then are the foregoing "social policies" translated into the creation of a new liability on the part of one who did not in any respect participate in putting "into the channels of commerce" the specific article that caused the specific plaintiff's injuries? The new liability is judicially created as a common law tort. The rationale is said to be this: the "successor corporation" *should* be held liable because: (1) it *may* protect itself by purchasing insurance, the cost of which *may* be passed on to the consumer of the product; (2) it is *presumed as a matter of law* to have a knowledge of possible hazards existing in products manufactured and sold by its predecessor, with the incentive and capacity to improve the product and control the risk *in the future;* and (3) it is *presumed* to benefit from the *assumed* goodwill and reputation engendered by the predecessor's product and should therefore bear the corresponding burden of any defect in that product. Barringer, *Expanding the Products Liability of Successor Corporations*, 27 Hastings L.J. 1305, 1322–32 (1976). The grounds asserted are light indeed and the scope of this rationale is astonishing, if

taken literally. It would, for example, equally justify imposing liability upon corporate employees, officers, directors, and holding companies, disregarding the corporate entity; or upon corporate suppliers, perhaps; or indeed upon any class of persons of whom it may vaguely be said that it "benefits" from the goodwill of the predecessor, controls the risk, and has the opportunity to purchase liability insurance. The rationale suffers from a fundamental and fatal flaw, however, and should in our view be considered and rejected for that reason alone.

At bottom, the rationale for imposing tort liability under the "product line" theory amounts to imposing upon the "successor corporation" a legal duty that it cannot possibly perform to *prevent* the specific injury it is called upon to redress by money damages. Thus, the "duty" so imposed is *not* the "duty" normally associated with tort law—the duty to avoid conduct that poses an unreasonable risk of harm to others—but instead a "duty" to make whole one who has suffered an injury, as an insurer is required more or less to do by its contract of insurance. Nor is it the "duty" which forms the basis of liability under Section 402A of the Restatement (Second) of Torts, upon which, it is said, the "product line" theory ultimately rests. That section of the Restatement, adopted in *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967), provides as follows:

§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) *One who sells any product* in a defective condition unreasonably dangerous to the user or consumer or to his property is *subject to liability* for physical harm *thereby caused* to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

(emphasis supplied). The emphasized words highlight the theory of the section, wherein liability may be imposed upon a seller without his being at "fault." But the scope of possible liability is not without limits and the limits are explicitly set forth in the section itself. First and foremost, the theory of the section is to make *one who sells* a product *subject to liability* for physical harm *thereby caused* to the ultimate consumer or user. The phrase "one who sells" implies, of course, that any liability under the section fastens upon the one who places the article in commerce. More importantly for our purposes, however, the phrase "subject to liability" also *circumscribes* the scope of possible liability. In comment *a* under § 5 of the Restatement, wherein the phrase is defined, we find the following summary of the phrase "subject to liability": "The phrase thus deals with so much of the circumstances and events *preceding a plaintiff's injury* as are within the defendant's *exclusive ability to control*" (emphasis added). The "product line" theory thus contradicts, by definition, this fundamental limitation which the Restatement imposes upon the doctrine of "products liability."

■■■ Most emphatically, then, the rationale of the "product line" theory—that it serves to advance the "social policies underlying strict products liability"—assuredly *cannot* find a juridical basis in the theory of products-liability tort actions, for *that* theory and cause of action, and the underlying "social policies," expressly *disclaim* imposing a duty upon one who has no ability to control the circumstances and events which preceded a specific plaintiff's injury.[3]

---

**3.** Various other portions of the comments to § 402A imply in the strongest possible terms

Nor can the "product line" theory find a basis in traditional tort law which requires (1) the imposition of a legal duty to *conduct* oneself in a manner that does not pose an unreasonable risk of harm to others, and (2) a breach of *that* duty by the one upon whom it is imposed by law.

Where then may one find the real basis for imposing tort liability upon a person who could not possibly conduct himself so as to avoid the specific injury suffered by a particular plaintiff? The reported decisions adopting the "product line" theory supply no real or explicit basis apart from their misplaced reliance upon § 402A of the Restatement (Second) of Torts. Really, those decisions merely declare a result. The liability they find simply floats between earth and sky, buoyed perhaps by the salutary policy that one should have reparation for his injuries but disregarding nevertheless the fundamental proposition that there is no pre-existing legal principle declaring that liability for such reparation shall descend and fasten upon the purchasing corporation, as opposed to any other person in the universe. Recognizing the want of legal precedent, they embrace but find rejection in § 402A of the Restatement. We find in such decisions patently insufficient analysis and justification for the raw judicial legislation they illustrate so vividly.

We find, however, that the present case is controlled by Texas precedents:

■ 1. We hold we are controlled by the rule laid down in *Mexican Nat. Construction Co. v. Middlegge*, 75 Tex. 634, 13 S.W. 257 (1890), a decision cited by neither party in the present appeal. Whether on a theory of nuisance, trespass, or escaping waters, the claim in that case was one of strict liability for injuries to land, brought against an adjoining corporate landowner and another corporation that had purchased the land as part of the railroad franchise and property of the first corporation. The purchaser continued to use the property in the same manner as the first corporation, allegedly causing further injury to the plaintiff's land. The Supreme Court wrote:

> It is too clear that this is not a case in which the Galveston & Western Railway Company, under the averments of plaintiff's pleadings, could become liable by ratification for any act done by the Mexican National Construction Company; *nor could it become liable for the acts of the latter company simply from the fact that it may have acquired the franchise and property of that company, and thus, in a sense, became its successor.* If, after the Galveston & Western Railway Company purchased the railway and land, the two corporations *acted together* in the commission of any unlawful act injurious to plaintiff, in so far they might have been joined as defendants; *but we do not see on what theory it was proper to join them as defendants in reference to matters which occurred before the Galveston & Western Railway Company had any connection with the acts on which it is evident plaintiff's action is mainly based.*

13 S.W. at 258 (emphasis added). In *Southwestern Gas, Light & Power Co. v. Jay*, 275 S.W. 735 (Tex.Civ.App.1925, writ ref'd), the rule was applied to bar imputing liability for personal injury to a corporation that had succeeded to the property and franchise of another, when the bona fides of the transaction were not impeached and the former had done no more than purchase all the assets and franchise of the latter.

■ 2. We are also constrained to follow the fundamental rule of this jurisdiction that a cause of action in tort depends

---

that liability may be imposed thereunder only as to those who could control the risk to which the specific plaintiff was exposed by the unreasonably dangerous product that caused his injury. *See, e.g.,* comment *g* where it is stated that the rule of the section "applies only where the product is, *at the time it leaves the seller's hands,*

in a condition not contemplated by the ultimate consumer ..."; and, further, where it is stated that the burden of proving the "defective condition at the time that it left the hands of the *particular* seller is upon the *injured plaintiff....*" (emphasis added).

upon the existence of a legal "duty" in the defendant to so conduct himself that he does not injure one to whom the duty is owed.[4] *Denison Light & Power Co. v. Patton,* 105 Tex. 621, 154 S.W. 540 (1913). In the Restatement (Second) of Torts § 4, where the word "duty" is similarly defined, we find the following comment:

> a. The duty which is defined in this Section is a duty that the actor shall conduct himself or not conduct himself in a particular manner. *It therefore imposes no obligation which is not within the actor's ability to perform, since it relates only to the actor's conduct over which as such he has control....*

(emphasis supplied). The "duty" implicit in the "products line" theory, and urged here, is far different indeed in that it explicitly imposes liability for injuries that, by definition, *precede* the defendant's capacity to perform or control the events and circumstances giving rise to the plaintiff's injury. We find no authority in our jurisdiction for such an exception to our general theory of tort law, under the case pleaded by appellant.

▮▮▮ We are not, as an intermediate appellate court, free to change the rules of law stated above by adopting the "products line" theory. And if we were, we would find more persuasive the far better reasoning of those decisions that have rejected the theory. *See, e.g., Bernard v. Kee Mfg. Co., Inc.,* 409 So.2d 1047 (Fla.1982); *Jones v. Johnson Mach. & Press Co., Etc.,* 211 Neb. 724, 320 N.W.2d 481 (1982); *Mahn Hung Nguyen v. Johnson Mach. & Press,* 104 Ill.App.3d 1141, 60 Ill.Dec. 866, 433 N.E.2d 1104 (1982); *Downtowner, Inc. v. Acrometal Products, Inc.,* 347 N.W.2d 118 (N.D.1984); *See also* Annot., *Products Liability of Successor Corporation,* 66 A.L.R.3d 824 (1975 & Supp.1984). Moreover, the very fact that the rationale by which vicarious liability is imposed upon a successor corporation, under the "products line" theory, is founded solely upon "public policies," implies in the strongest possible terms that the proper province for dealing with any underlying policies is in the legislative department of government and not the judicial, particularly since other "public policies" of equal importance are involved and must be accommodated or adjusted in the process, a task for which the judicial department is uniquely ill-suited for a multitude of reasons.[5]

---

4. At the base of *every* tort case in which liability is imposed on a defendant, there *must* be a duty. Duty may be explicitly stated or assumed. In most cases the defendant's duty is assumed—some undisclosed major premise. This is only saying that the liability of a defendant must rest upon some rule or principle of law which comprehends defendant's conduct and protection of the victim against the risk of injury created by defendant's conduct. There is no mystery about duty; it has no magic; it does not point imperatively to liability; and it is a very useful concept. If it is once stated with clarity, the solution of a case is not far afield. Many judges seem hesitant to come to grips with the duty issue. But the able advocate should never permit the issue to be slurred over. In most of the erroneous decisions made by courts, the duty issue has either gone by default or has been misconceived. Further, the duty issue, for purposes of litigation, should always be stated specifically: Does the defendant's duty, whatever it may be, extend to the specific injury which the victim has received?

Green, *Duties, Risks, Causation Doctrines,* 41 Tex.L.R. 42, 45–46 (1962).

5. For example, the "product line" theory would raise extraordinary and unsettling questions relative to: (a) the reality of the consent by which a business is purchased if the buyer is faced with startlingly new and enormous obligations to injured persons that he had no reason to anticipate in settling upon the price he would pay; (b) the fairness and justice of a catchall statute of limitations, in light of the purposes of statutes of limitation, when the buyer may be held liable for injuries occurring as much as 27 years after the product was sold by the predecessor corporation, as happened in one case; (c) the possible "annihilation" of small businesses, as pointed out in another case; (d) the unfairness of giving "notice" to purchasers of going businesses in the form of a new liability imposed by a judicial decision in a particular case, rather than by statute, precluding the possibility of protective action being taken by the class of persons made subject to the new exposure; (e) the consideration and working out of a rational basis for the treatment of "successor corporations" differently from partnerships or natural persons who purchase the assets and going business of another, so that the different treatment may be constitutionally justified; (f) the working out of the standards by which it may be held

We therefore overrule appellant's first point of error.

## The Claim of Negligence

In appellant's second point of error he contends the summary judgment was erroneous "because the court had insufficient evidence to determine that all of the plaintiff's general negligence and strict liability causes of action were negated; especially failure to warn...." We overrule this point of error for two reasons, as discussed below.

■■■■ 1. *Strict liability.* Appellant's first amended original petition, under which the motion for summary judgment was considered and determined, *does not allege* that any act or omission *by appellee* was the producing cause of his injury. Therefore, if every allegation in that petition be taken as true, he may not recover thereon from appellee, in strict liability, based upon anything appellee did or failed to do, for appellant has not attempted to plead a cause of action to that effect, even under the most liberal interpretation possible. Instead, appellant's claim of strict liability on the part of appellee is *expressly limited* by him to the theory of *vicarious* liability arising from the acts or omissions *of the dissolved corporation.* Our decision on that theory, given above, is based upon an assumption that appellant's pleading is true in its statement that appellee purchased the assets and going business of the dissolved corporation. There can be no issue of *material* fact, precluding summary judgment under Tex.R.Civ.P.Ann. 166–A (1976 & Supp.1984), where no fact is in controversy and the only barrier to judgment is a question of law, as we have in the present case. There is no question here of the *adequacy* of appellant's pleadings to state a "cause of action." Rather, it is a question of whether his plainly stated theory of action is cognizable at all under Texas

law. It is not, for the reasons discussed under appellant's first point of error.

■■■ 2. *Negligence.* As discussed above, appellant's trial pleading, alleging a cause of action against appellee, was based solely upon the theory of "strict" or "products liability," under which he would impute liability to appellee by reason of its purchasing the assets and "going business" of the dissolved corporation. While carefully alleging his *negligence* causes of action solely against the dissolved corporation, he alleged absolutely no cause of action for negligence against appellee, under the most liberal interpretation possible. Nevertheless, in appellant's second point of error, he complains *post hoc* that summary judgment was improper because the summary-judgment record was insufficient for the trial court to hold that his *negligence* causes of action against appellee were negatived. There was, of course, no need for such a holding by the trial court for no negligence causes of action were alleged against appellee, and the judgment does not purport so to hold.

■■■■ Is it possible to interpret appellant's pleading as setting forth a case of vicarious liability in appellee for injuries caused by the *negligence* of the dissolved corporation? It is, of course, possible in some cases to impute negligence liability to a non-actor because of some special relationship, such as master and servant, driver and passenger, owner and driver, bailor and bailee, partnership, joint enterprise, and so forth, and corporate entities may be disregarded under a theory of alter ego or equitable estoppel. *But there is no pleading in the present case suggesting any such theory of vicarious liability for negligence.*

■■■ Instead, appellant's sole pleading against appellee is that appellee is *strictly* liable for the acts and omissions of the dissolved corporation, under the products-li-

---

that a purchaser is indeed continuing the same "product line" as the predecessor corporation; and, of course, (g) there is the question of whether the new liability actually reflects the reality of the "social policies" upon which it is

said ultimately to rest. These are not the *only* "social policies" affected by the "product line" theory, and the legislature itself would face an enormous task in formulating and adjusting all the logically relevant policies.

ability doctrine and as a matter of law, because it purchased the assets and "going business" of the dissolved corporation. In this state of the pleadings, we hold that appellant's own pleadings affirmatively negative any cause of action he asserts against appellee, for his pleading states unequivocally that the dissolved corporation made and supplied the allegedly defective product that caused his injuries. *Texas Department of Corrections v. Herring,* 513 S.W.2d 6 (Tex.1974). We overrule appellant's second point of error.

The summary judgment of the trial court is affirmed.

GAMMAGE, J., not participating.