**ADOLPH COORS COMPANY** and
Larry Lightfoot, Appellants,

v.

Joe A. **RODRIGUEZ** and R & R Coors
Distributing Company, d/b/a, Coors R
& R Distributing Company, Appellees.

No. 13–88–316–CV.

Court of Appeals of Texas,
Corpus Christi.

Nov. 16, 1989.

Rehearing Overruled Dec. 14, 1989.

**478**

Harry M. Reasoner, Alison Smith, Christine E. Cleveland, Marie R. Yeates, Vinson & Elkins, Houston, Frank E. Perez, Royston, Rayzor, Vickery & Williams, Brownsville, Victor Boog, Leo Bradley, Bradley, Campbell & Carney, Golden, Colo., for appellants.

Dana Kirk, Don M. Kennedy, Kirk & Carrigan, P.C., Mitchell Chaney, Rodriguez, Colvin and Chaney, Brownsville, for appellees.

Before UTTER, SEERDEN and DORSEY, JJ.

## OPINION

UTTER, Justice.

The Adolph Coors Company (Coors) and Larry Lightfoot, former Coors divisional sales manager, appeal from a judgment rendered against them in favor of R & R Coors Distributing Company (R & R) and Joe Rodriguez, the managing partner of R & R. We reverse the judgment of the trial court and render judgment that R & R and Rodriguez take nothing.

R & R and Rodriguez alleged causes of action against Coors and Lightfoot for breach of the distributorship contract, violation of the Texas Deceptive Trade Practices Act (DTPA), Tex.Bus. & Com.Code Ann. §§ 17.41—17.63 (Vernon 1987), violation of the Beer Industry Fair Dealing Law, Tex.Alco.Bev.Code Ann. §§ 102.71—102.81 (Vernon Supp.1989) (BIFDL), breach of the duty of good faith and fair dealing, negligence, tortious interference with the proposed sales of the distributorship, conspiracy, and libel and slander.

At trial, the court granted an instructed verdict for Coors on R & R's claims for breach of contract and violation of the DTPA. No appeal has been perfected from this action of the trial court. The trial court then submitted R & R's claims against Coors under BIFDL, and for breach of good faith, negligence, tortious interference and conspiracy. The trial court also submitted R & R's claim against Coors for libel and slander.

Judgment was granted on the verdict that R & R recover from Coors $1,500,000 as compensation for the value of the distributorship under BIFDL, $1,500,000 for

actual damages resulting from Coors' breach of the duty of good faith, negligence, tortious interference and conspiracy, and $10,000,000 in punitive damages. R & R also recovered $350,000 against Lightfoot individually on the tortious interference claim, provided that R & R could only recover $1,500,000 in total against Coors and Lightfoot as actual damages. In addition, Rodriguez individually recovered against Coors $1,000,000 in punitive damages on the defamation claim though he sustained no actual damages. Finally, the trial court ordered R & R to convey the distributorship back to Coors upon payment by Coors to R & R of the $1,500,000 BIFDL compensation award. Coors and Lightfoot appeal this judgment by forty-three points of error.

By their thirteenth, fourteenth and sixteenth points of error, appellants challenge the legal and factual sufficiency of the evidence to support the jury's findings that Coors terminated R & R without good cause and that Coors unreasonably withheld or delayed its approval of a sale of R & R.

In considering a "no evidence", "insufficient evidence" or "against the great weight and preponderance of the evidence" point of error, we will follow the well-established test set forth in *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456 (Tex.1985); *Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Allied Finance Co. v. Garza*, 626 S.W.2d 120 (Tex. App.—Corpus Christi 1981, writ ref'd n.r. e.); and Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 Texas L.Rev. 361 (1960).

The record reflects that Coors notified R & R in March and May of 1987 of its intention to terminate R & R as a distributor on July 31, 1987. R & R claims that Coors then discouraged prospective purchasers from buying R & R and interfered with various attempts by Rodriguez to sell the distributorship. The threatened termination led to the present lawsuit, which initially resulted in a temporary injunction prohibiting Coors from terminating R & R.

The following jury questions were submitted and answered accordingly:

2. Do you find that Coors, but for the temporary injunction entered by this Court, terminated R & R as a distributor? "Yes."

2(a) Do you find Coors terminated R & R as a distributorship without good cause? "Yes."

2(b) Do you find that Coors unreasonably withheld or delayed its approval of any assignment, transfer, or sale of R & R's assets to another? "Yes."

In conjunction with these jury questions and referable to them, the court further inquired, and the jury answered, the following damages question:

11. What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence, would fairly and reasonably compensate R & R for the fair market value of the distributor's business with relation to the Coors brands, including "goodwill?"

ANSWER: "$1,500,000.00."

Through these jury questions, R & R attempted to establish a right to compensation under the statutory causes of action for wrongful termination and wrongfully withholding consent to a sale of the distributorship under the Beer Industry Fair Dealing Law (BIFDL). Tex.Alco.Bev.Code Ann. § 102.71–102.81 (Vernon Supp.1989).

Section 102.77(a) provides that:

Any Manufacturer who, without good cause, cancels, terminates, or fails to renew any agreement, or unlawfully denies approval of, or unreasonably withholds consent, to any assignment, transfer, or sale of a distributor's business assets or voting stock or other equity securities, shall pay such distributor with whom it has an agreement pursuant to Section 102.51 of this code the fair market value of the distributor's business with relation to the affected brand or brands.

Recently in *Ace Sales Co. v. Cerveceria Modelo, S.A. de C.V.*, 739 S.W.2d 442, 447 (Tex.App.—Corpus Christi 1987, writ de-

nied), we applied to BIFDL the long recognized rule that, if a cause of action and remedy for its enforcement are derived not from the common law but from a statute, the statutory provisions are mandatory and exclusive, and must be complied with in all respects or the action is not maintainable. *See Texas Catastrophe Property Insurance Association v. Counsel of Co-owners of Saida II Towers Condominium Association*, 706 S.W.2d 644, 646 (Tex.1986).

■ Under Section 102.77(a), no cause of action for wrongful termination accrues until an actual termination of the distributorship by the manufacturer. At trial, the evidence was undisputed that R & R had not been terminated and had remained a Coors distributor, and that Coors had been enjoined from terminating R & R. R & R seems to argue that Coors by its actions had, for all practical purposes, treated R & R as if it had been terminated as a distributor, and that R & R should not be required to wait for a formal termination to occur before pursuing a termination cause of action. We will not, however, extend the language of Section 102.77(a)'s termination provisions to include pre-termination wrongs by the manufacturer. There was no termination of R & R Distributorship and, therefore, there was no evidence to support the jury's answers to Jury Question 2(a).

R & R also contends, however, that the $1,500,000 award can be supported by the jury's finding in response to Jury Question 2(b), that Coors unreasonably withheld or delayed its consent to a sale of the distributorship, which gives rise to a separate cause of action, also under Section 102.77(a). Section 102.76(a) further defines when withholding or delaying consent to a sale would be unreasonable as, "whenever the person or persons to be substituted meet reasonable standards imposed not only upon the distributor but upon all other distributors of that manufacturer of the same general class."

■ We find no evidence that Coors unreasonably withheld or delayed its consent to any proposed sale of the distributorship. It was uncontroverted that none of the potential sales came to fruition and that neither R & R nor any of the prospective purchasers ever sent Coors a completed purchase agreement or applied to Coors for approval as a new owner, as required under the Sale of Distributorship clause of R & R's distributorship agreement with Coors. R & R relies solely on Coors' unwillingness to inject itself into the negotiation process with a prospective purchaser, Leonard May, with whom R & R had negotiated a letter of intent to buy the distributorship, contingent upon a number of factors. Rodriguez sent a copy of the letter of intent to Coors for immediate approval, but Coors responded by requesting that R & R follow the proper procedures for sale of a distributorship, which requires R & R and the prospective purchaser to send Coors a completed purchase agreement and distributorship application.

R & R's request for approval was clearly premature to any actual agreement for sale of the distributorship, and Coors' request that proper procedures be followed cannot be characterized as rejection or delay. Since its consent was never properly requested, Coors never had the opportunity to unreasonably withhold or delay its consent or even to investigate whether the prospective purchasers met reasonable standards imposed upon Coors distributors. There was no evidence to support the jury's answer to Jury Question 2(b).

Having found no evidence to support R & R's BIFDL causes of action, we hold that there is no basis to support the award of $1,500,000 pursuant to the jury's answer to Jury Question 11, which is referable only to the BIFDL causes of action. We sustain appellants' thirteenth, fourteenth and sixteenth points of error.

By their eleventh and twelfth points of error, appellants complain that the evidence is legally and factually insufficient to support the jury's findings that Coors failed to exercise good faith in the performance of the distributorship agreement or that any such failure was willful or intentional.

The duty of good faith and fair dealing in the performance of a contract presently

exists in Texas both under the Uniform Commercial Code, Tex.Bus. & Comm.Code Ann. § 1.203 (Vernon 1968), as a part of every commercial contract, and also in limited circumstances under common law as a basis for tort liability. Coors asserts that the present claim could only have been brought as a contract cause of action under Section 1.203, while R & R contends that the claim sounds in tort. We will discuss both possible bases for the cause of action.

In *Arnold v. National County Mutual Fire Insurance Co.*, 725 S.W.2d 165 (Tex. 1987), the Texas Supreme Court recognized that, where a "special relationship" exists between the parties to a contract, there is a common law duty of good faith and fair dealing, breach of which may give rise to a cause of action in tort and the right to recover both actual and punitive damages. In *Arnold* the Supreme Court found such a special relationship arising out of an insurance policy by virtue of:

> the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims. In addition, without such a cause of action insurers can arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed. An insurance company has exclusive control over the evaluation, processing and denial of claims.

*Id.*, at 167; *see also Aranda v. Insurance Co. of North America*, 748 S.W.2d 210, 212 (Tex.1988); *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 228, 765 P.2d 373, 395 (1988). This type of contract creates a relationship that is, for public policy reasons, treated with more respect and protection than the ordinary economic relationships created by contractual agreements.

■ The "special relationship" cause of action in tort for breach of the duty of good faith and fair dealing, however, does not extend to ordinary commercial contractual relationships such as the supplier-distributor relationship. *See Premier Wine & Spirits of South Dakota, Inc. v. E.J. Gallo Winery*, 644 F.Supp. 1431, 1436 (E.D.Cal. 1986); *McClendon v. Ingersoll–Rand Co.*, 757 S.W.2d 816, 819–20 (Tex.App.—Houston [14th Dist.] 1988), *rev'd on other grounds*, 779 S.W.2d 69 (Tex.1989). The nature of the supplier-distributor relationship does not require special protection, nor does the supplier have the same exclusive control over the distributor's business that the insurer has over the insured's claim. We are unwilling to extend the ambit of this concept of special relationship to include commercial contracts of the present sort. Absent an *Arnold* "special relationship," the duty to act in good faith is contractual in nature and its breach does not amount to an independent tort. *Transcontinental Gas Pipe Line Corp. v. American National Petroleum Co.*, 763 S.W.2d 809, 820 (Tex. App.—Texarkana 1988, writ denied); *see also Rigby Corp. v. Boatmen's Bank and Trust Co.*, 713 S.W.2d 517, 535–37 (Mo. App.1986).

The contractual duty of good faith in a commercial setting such as the present case has been codified under the Uniform Commercial Code, Tex.Bus. & Com.Code Ann. § 1.203 (Vernon 1968), which provides that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." *See La Sara Grain Co. v. First National Bank of Mercedes*, 673 S.W.2d 558, 563 (Tex.1984); *cf.* Restatement (Second) of Contracts § 205 (1981).[1]

In addition, where the party is a merchant, his standard of good faith performance under the contract requires honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade. Tex.Bus. & Com.Code Ann. § 2.103(a)(2) (Vernon 1968); *see Brattleboro Auto Sales, Inc. v. Subaru of New England, Inc.*, 633 F.2d 649, 651 (2nd Cir.

---

**1.** Section 205 of the Restatement parallels Section 1.203 of the Code with a formulation of the same principle in the common law that, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

1980) (Application of Vermont Code §§ 1.203 & 2.103 to attempted termination of automobile dealer's franchise); *Printing Center of Texas, Inc. v. Supermind Publishing Co.*, 669 S.W.2d 779, 784 (Tex.App.—Houston [14th Dist.] 1984, no writ).

However, failure to act in good faith under Section 1.203 does not state an independent cause of action. *Management Assistance, Inc. v. Computer Dimensions, Inc.*, 546 F.Supp. 666, 677 (N.D.Ga.1982). The duty of good faith and fair dealing is aimed at making effective the agreement's promises. *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 227, 765 P.2d 373, 395 (1988). It defines other duties which grow out of specific contract terms and obligations. *Gordon v. Matthew Bender & Co.*, 562 F.Supp. 1286, 1289 (N.D.Ill.1983); *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 91 (1983); *see also Bak-a-lum Corp. v. Alcoa Building Products, Inc.*, 69 N.J. 123, 351 A.2d 349, 352 (1976). Therefore, in order to be actionable as a breach of contract under Section 1.203, bad faith conduct must relate to some aspect of performance under the terms of the contract. *See Stewart & Stevenson Services, Inc. v. Enserve, Inc.*, 719 S.W.2d 337, 345 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *Supermind*, 669 S.W.2d at 784.

If the factfinder were allowed to write into the contract other terms that it may believe are fair under the circumstances, then any contract the parties enter into would be subject to being re-written to better suit the court or jury's view of what the parties should in "good faith" have provided for in the agreement, regardless of what they actually did or did not provide. In *English v. Fischer*, 660 S.W.2d 521 (Tex.1983), the Texas Supreme Court warned that this sort of an implied covenant would effectively abolish settled rules of contract law and "let each case be decided upon what might seem 'fair and in good faith,' by each fact finder." *English*, 660 S.W.2d at 522.

R & R does not specify which terms of the contract Coors had performed in bad faith. Instead, R & R lists a number of acts and omissions by Coors that form the basis for R & R's breach of duty claim. Specifically, R & R points to Coors' failure to allow it to sell premium brands of beer, wrongful termination of R & R's distributorship, refusal to extend the credit necessary to enable R & R to purchase sufficient quantities of beer, failure to provide R & R with adequate promotional and advertising support, and discussions with potential purchasers which apparently interfered with R & R's negotiations for the sale of the distributorship. We will address each of these alleged breaches separately.

■ First, R & R presented evidence that, at a time when two of Coors' premium brands of beer, Herman Joseph and Coors Extra Gold, were sold to almost all other Coors distributors in Texas, Coors failed to allow R & R to sell these brands. The distributorship agreement itself, however, specifically addresses the brands of beer that Coors gave R & R the right to sell. Paragraph I of the agreement states that, "Coors appoints [R & R] as a distributor of the Coors beer products listed on Exhibit A," which lists only Coors, Coors Light, and George Killian brands of beer. The agreement did not grant R & R the right to sell any other brands. The agreement made by the parties and embodied in the contract itself cannot be varied by an implied covenant of good faith and fair dealing. *Exxon Corp. v. Atlantic Richfield Co.*, 678 S.W.2d 944, 947 (Tex.1984). Since the distributorship agreement explicitly stated the brands of beer that R & R was being granted the right to sell, the implied covenant or duty of good faith could not enlarge R & R's rights to sell other brands of beer. The fact that Coors had denied R & R the right to sell other brands provides no evidence of a breach of that covenant or duty.

Next, as for R & R's claim that a breach of the duty of good faith can be found in Coors' wrongful termination of its distributorship, our discussion of points thirteen, fourteen and sixteen, where we found no evidence of any actual termination, is dis-

positive of any claim of bad faith termination.

Further, R & R contends that Coors wrongfully refused to extend the credit necessary to enable R & R to purchase sufficient quantities of beer to supply the needs of its market. Joe Rodriguez testified that R & R had a standing $60,000 line of credit with Coors, secured by letters of credit in that amount. Generally, Coors required R & R not to exceed this $60,000 limit in its purchases of beer on credit. Rodriguez specifically complains that Coors refused to extend R & R's credit beyond this $60,000 secured amount during the 1987 Spring Break period, when R & R's beer requirements necessitated purchases of around $240,000.

The distributorship agreement did not obligate Coors to extend credit to R & R, but under Paragraph IV gave Coors "the right to require guarantee agreements and to establish terms and conditions of sales to [R & R]." In addition, there is no evidence that reasonable commercial standards in the trade required Coors to extend credit to its distributors for their purchases. Since the extension of credit to R & R was not required under the terms of the contract, nor can we say that such a requirement grew out of specific contract terms and obligations, Coors simply had no good faith duty to extend credit to R & R. *See Gordon,* 562 F.Supp. at 1289; *Murphy,* 461 N.Y.S.2d at 237, 448 N.E.2d at 91; *Enserve,* 719 S.W.2d at 345; *Supermind,* 669 S.W.2d at 784.

The distributorship agreement may create a relationship under which the distributor trusts the manufacturer to make reasonable efforts to enable the distributor to sell the product, but this trust relationship does not make the manufacturer generally responsible for the success or failure of its distributors. In *English,* 660 S.W.2d at 522, the Court rejected the principle that in every contract an implied duty of good faith restricts either party from doing anything to injure the right of the other party to receive the benefits of the agreement. The corollary of this proposition is that neither should the parties be subject to an implied affirmative duty requiring them to do everything they can to uphold and protect the rights of the other to receive the benefits of the agreement. Coors was not required to do anything outside the terms of the contract to ensure that R & R would be sound enough financially to receive the benefits it expected from the agreement.

Additionally, R & R contends that Coors failed to provide it with adequate promotional and advertising support to compete with the other major brands of beer sold in its territory. Coors employees admitted that, while Coors is the fifth largest brewer in the United States, it has only 5% of the market share in the Brownsville area, and that Coors spends less on advertising than its primary competitors, Anheuser-Busch and Miller. Specifically, R & R complains and the evidence showed that, while Anheuser-Busch and Miller spent $250,000 to promote their beers by sponsoring beach concerts and sending brewery representatives into the area during Spring Break 1987, Coors did nothing but send minor promotional items to R & R. Rodriguez also testified that Coors has provided minimal advertising and promotional funds to reach the Hispanic market in R & R's area.

The distributorship agreement is silent about any obligation on the part of the manufacturer to promote its product through advertisements and other promotional materials. Nor is there any evidence that reasonable commercial standards in the trade required Coors to advertise and promote its product in R & R's market in any certain way or to any certain extent. For the same reasons we discussed in response to R & R's complaint about Coors' failure to extend credit, we will not allow the factfinder to imply a good faith duty to advertise which is not connected to any term of the agreement.

Finally, R & R claims that at a time when Coors had indicated an intent to terminate its distributorship, Coors representatives had discussions with several potential purchasers which interfered with R & R's negotiations for the sale of the distributorship. Rodriguez testified that he began

having financial problems in 1984 and since that time has tried to sell his distributorship to a number of prospective purchasers, including Ben Cantu and Ken Kendrick, Geoff Westapher, Ken Sewell, Eddie Cano, and Leonard May. In each instance, however, the negotiations for the sale of R & R ceased shortly after discussions between the prospective purchaser and Coors employees, and none resulted in a written contract signed by both parties.

■ R & R claims that Coors encouraged the prospective purchasers not to purchase R & R's distributorship, but to wait until Coors terminated R & R and could offer them the same territory without the cost of purchasing it along with the facilities and equipment from R & R. These accusations are not grounded on any evidence of the conversations that actually took place between Coors employees and the prospective purchasers, but are purely Rodriguez' own speculation about why negotiations for the sale of his distributorship failed. In response to the following question asked by counsel for Coors:

Q: Now, was it your position that the mere fact that a conversation took place between a prospective purchaser of Coors R & R and Adolph Coors Company, that that constitutes wrongful and intentional interference?

Rodriguez answered:

Sir, all I know is that all these deals fell through and that they were having conversations with people above, all the way to the level of Frank Spinosa, that I didn't know of were taking place and they all fell through.

In each instance, the record reflects that there were other, unrelated reasons for the failure of the parties to reach an agreement. Coors, however, violated no duty by merely having discussions with third parties who showed some interest in purchasing R & R's distributorship.

Coors' discussions with third parties was not a part of its performance under the terms of the distributorship agreement with R & R. No implied contractual duty restricts Coors from communicating with potential purchasers of R & R's distributorship, even if it may injure R & R's rights under the agreement to attempt a sale. *See English,* 660 S.W.2d at 522. We sustain appellants' eleventh and twelfth points of error.

By its seventeenth point of error, appellants complain that the evidence is legally and factually insufficient to support the jury's finding that Coors' negligence proximately caused damages to R & R.

In Plaintiffs' Fourth Amended Petition, R & R asserted a cause of action against Coors for negligence based on a general allegation that, "Adolph Coors Company has been negligent in its conduct, dealings and representations to Plaintiffs or third parties dealing with Plaintiffs and such negligence is a proximate cause of damages to Plaintiffs as set out herein." The trial court later submitted and the jury answered affirmatively R & R's negligence claim.

Though R & R has not specified what particular actions it bases its negligence claim on, it appears to rely on the same list of acts and omissions by Coors that formed the basis for R & R's claim for breach of the duty of good faith. We initially note that in order to establish tort liability, plaintiff must prove the existence and violation of a legal duty owed to him by the defendant. *Abalos v. Oil Development Co. of Texas,* 544 S.W.2d 627, 631 (Tex. 1976); *Griggs v. Capitol Machine Works, Inc.,* 690 S.W.2d 287, 293–94 (Tex.App.— Austin 1985, writ ref'd n.r.e.). We will analyze each possible ground of negligence by examining whether Coors owed or violated any such legal duty to R & R.

■ R & R contends that Coors was negligent in the performance of its duties under the contract by failing to allow R & R to sell premium brands of beer, refusing to extend the credit necessary to enable R & R to purchase sufficient quantities of beer, and failing to provide R & R with adequate promotional and advertising support. The contract did not expressly obligate Coors to perform any of these duties; they arose, if at all, as a result of obligations implied under the contract. How-

ever, in our analysis of points of error eleven and twelve, we have already discussed the reasons that these duties could not be implied as good faith obligations on the part of Coors in its performance of the contract. Coors had no duty to perform any of these. Therefore, it could not have been negligent in failing to perform them.

Even if the above duties could be implied from the terms of the distributorship agreement, breach would not necessarily give rise to a negligence cause of action.

Texas has long adhered to the principle set out in *Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 204 S.W.2d 508, 510 (1947), that:

> Accompanying every contract is a common law duty to perform with care, skill, reasonable expendience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract. In such a case, the contract is mere inducement creating the state of things which furnishes the occasion of the tort. In other words, the contract creates the relation out of which grows the duty to use care.

*See also Coulson v. Lake L.B.J. Municipal Utility District*, 734 S.W.2d 649, 651 (Tex. 1987).

■ However, this does not mean that every breach of contract is also a tort. The nature of the injury itself generally determines whether the action sounds in contract alone or also in tort. When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986); *see also Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 571 (Tex.1981) (breach of the implied covenant to protect against drainage in an oil lease does not give rise to an action in tort). In the present case, the injuries R & R claimed resulted from Coors' failure to allow it to sell premium beers, failure to advertise, and failure to extend credit, consisted merely of economic loss of sales to R & R's distributorship. Coors' conduct does not give rise to an independent negligence cause of action.

In addition, R & R contends that Coors was negligent in wrongfully terminating its distributorship and wrongfully refusing to accept a transfer of the distributorship to Leonard May. However, as we discussed earlier in connection with points thirteen, fourteen and sixteen, no actual termination occurred; neither did Coors refuse to accept May as a new distributor. There is no evidence of a breach to support liability in tort on these grounds. *See Abalos*, 544 S.W.2d at 631; *Griggs*, 690 S.W.2d at 293–94.

Finally, R & R contends that Coors was negligent through the actions of Larry Lightfoot and other Coors employees in their discussions with potential purchasers which allegedly interfered with R & R's negotiations for the sale of the distributorship. As we stated in connection with points eleven and twelve, R & R generally presented nothing but Rodriguez' own speculation that Coors employees said something to interfere with R & R's attempts to sell. Coors violated neither a contractual nor a tort duty merely by having discussions with potential purchasers.

The only specific instance that R & R points to is an alleged misrepresentation by Lightfoot to Cantu and Kendrick that R & R had misrepresented its case sales to them. Rodriguez testified that he had a final agreement for the sale of the distributorship to Cantu and Kendrick for $1,595,000, which was in the process of being drawn up by the lawyers when Cantu and Kendrick discussed the sale with Larry Lightfoot. They subsequently cancelled the agreement. Lightfoot later told Rodriguez that, based on Coors' figure of 140,000 cases for 1984, Rodriguez had overstated his sales to Cantu and Kendrick by 40,000 cases. However, Rodriguez claimed that there was only a 2,000 case discrepancy between the figure he had given Cantu and Kendrick and Coors' figure. Cantu and Kendrick later came back to Rodriguez with an offer $300,000 less than the previous one; however, this deal also fell through when Kendrick's divorce prevented him from participating in the transaction.

■ There is no dispute that Coors' 1984 sales figure for R & R of 140,000 cases is accurate. Assuming that Rodriguez gave Cantu and Kendrick a figure within 2,000 cases of Coors' figure, we can only speculate about the origin of the erroneous figure that led Lightfoot, Cantu and Kendrick to believe that Rodriguez had overstated R & R's case sales. There is no evidence to suggest that Lightfoot himself supplied the erroneous figure. Assuming Cantu or Kendrick misrepresented to Lightfoot the figure that Rodriguez had given them, Lightfoot breached no duty in noticing and pointing out that this figure was incorrect. We sustain appellants' seventeenth point of error.

By their eighteenth and nineteenth points of error appellants complain that the evidence is legally and factually insufficient to support the jury's findings that Coors through any of its employees, or Lightfoot individually, tortiously interfered with R & R's business relationships.

■ To establish a cause of action for tortious interference, the plaintiff must show that the defendant maliciously interfered with a contractual or business relationship. *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105, 107 (Tex.1984).[2] R & R contends that Coors and Lightfoot tortiously interfered with its business relationships by having discussions with potential purchasers which allegedly interfered with R & R's negotiations for the sale of its distributorship. We note yet again that R & R generally presented nothing but Rodriguez' own speculation that Coors employees said something to interfere with R & R's attempts to sell.

R & R primarily relies on Lightfoot's alleged misrepresentation to Cantu and Kendrick that R & R had misrepresented its case sales to them. As we stated earlier, we can only speculate about the origin of the erroneous figure that led Lightfoot, Cantu and Kendrick to believe that Rodriguez had overstated R & R's case sales,

and neither Lightfoot, nor Coors through Lightfoot, tortiously interfered with R & R's business relationship merely by noticing and pointing out that this figure was incorrect.

R & R also contends that Coors chilled its negotiations for sale of the distributorship generally by giving "word of termination" to the potential purchasers. In other words, Coors allegedly let them know that it was contemplating a termination of R & R, which tended to discourage them from purchasing what they might later obtain without charge directly from Coors. R & R, however, presented no evidence that Coors ever discussed termination with the potential purchasers. R & R only presented evidence that Rodriguez expressed his concern to Coors about "word of termination" getting out, and that Coors attempted to assist R & R find a purchaser for its distributorship, neither of which suggest that Coors or Lightfoot ever wrongfully informed anyone of an intended termination of R & R. We sustain appellants' eighteenth and nineteenth points of error.

By their twentieth point of error appellants complain that the evidence is legally and factually insufficient to support the jury's affirmative finding that Coors entered into a conspiracy with Cano to appoint him the distributor for R & R's territory.

■ An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The elements are: 1. two or more persons; 2. an object to be accomplished; 3. a meeting of minds on the object or course of action; 4. one or more unlawful, overt acts; and 5. damages as a proximate result. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983).

In the present case, R & R argues that Coors and Cano planned to replace R & R with Cano as a distributor in an illegal

---

**2.** *Sakowitz* also placed the burden on the plaintiff to show that the interference was without legal justification or excuse. However, in *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690

(Tex.1989), the Texas Supreme Court overruled *Sakowitz* by placing the burden on the defendant to show legal justification or excuse as an affirmative defense.

manner by terminating R & R without good cause and without compensation under BIFDL. To show such a plan or scheme, R & R relies on the following indicia: Coors policy of encouraging mergers of its Texas distributors, its recommendation that Cano and R & R discuss consolidating or merging, and its discussions with Cano about purchasing R & R; Cano's business plan for expanding into the Brownsville market, but his reluctance to purchase R & R's warehouse and equipment or to pay Rodriguez's asking price (over the years, Rodriguez and Cano had discussed such a sale, but Cano had never been interested in purchasing the warehouse and Rodriguez has never been willing to sell R & R without it.); Coors' internal memoranda suggested that Cano would be a candidate for appointment if R & R were terminated; Coors' notice of intent to terminate R & R; and Cano's recent sale of beer to retailers in R & R's territory. R & R infers from Coors' and Cano's communications and actions that they had agreed for Coors to illegally terminate R & R so that it could then give Cano R & R's territory.

■ However, the gist of a civil conspiracy is the damage resulting from commission of a wrong which injures another, and not the conspiracy itself. *Schlumberger Well Surveying Corp. v. Nortex Oil and Gas Corp.*, 435 S.W.2d 854, 856 (Tex. 1968). Though R & R may be able to show some evidence of a meeting of the minds between Coors and Cano about the advantages of Cano's eventually taking over the Brownsville area either through purchase from R & R or directly from Coors after termination of R & R, neither party to the alleged agreement took any unlawful, overt acts against R & R causing damages as a proximate result. *See Frost National Bank v. Matthews*, 713 S.W.2d 365, 369–70 (Tex.App.—Texarkana 1986, writ ref'd n.r. e.).

Had R & R actually been terminated and Cano appointed to fill the vacancy, this might suggest that Coors and Cano had previously arranged the entire sequence of events. However, as we pointed out in our discussion of points of error thirteen, fourteen and sixteen, no termination occurred and R & R was still the Coors distributor for the Brownsville area at the time of trial. Neither did R & R prove any damages flowing from Coors' notice of intent to terminate the distributorship, or provide any evidence that the sale of beer by Cano to retailers in R & R's territory was in any way connected to the alleged conspiracy or harmed R & R in any way. We sustain appellants' twentieth point of error.

By their twenty-seventh and twenty-eighth points of error, appellants challenge the legal and factual sufficiency of the evidence to support the jury answers, in which the jury assessed damages to R & R caused by the conduct of Coors at $1,500,000, and damages to R & R caused by the conduct of Lightfoot at $350,000, respectively. By their fifth point of error, appellants claim that the verdict will not support the award of actual damages in favor of R & R.

R & R's claims for breach of the duty of good faith and for negligence were dependent upon R & R showing some amount by which Coors' conduct damaged its business. Rodriguez testified that he did not believe that R & R would have sustained the business losses that it did between 1982 and 1987 if Coors had provided it with adequate advertising and promotional support, allowed it to sell Coors' premium beers, and given it the credit that it needed to purchase adequate amounts of beer. However, neither Rodriguez nor any other witness even attempted to calculate the extent these alleged breaches contributed to the losses R & R sustained over the years.

■ In order to recover lost profits, sufficient evidence must be produced to enable the jury to determine the net amount of lost profits with reasonable certainty. It is not necessary that the lost profits be subject to exact calculation. However, opinions or estimates of lost profits must be based upon objective facts, figures or data from which the amount of lost profits can be ascertained with a reasonable degree of certainty and exactness. *White v. Southwestern Bell Telephone*

Co., 651 S.W.2d 260, 262 (Tex.1983); *Frank B. Hall & Co. v. Beach, Inc.*, 733 S.W.2d 251, 258 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.). In the present case, the evidence was legally insufficient to show any certain amount of lost profits resulting from Coors' conduct.

We sustain appellants' twenty-seventh, twenty-eighth, and fifth points of error.

Having found that there is no evidence or insufficient evidence to support any amount of damages under the various theories, neither will the verdict support the award of $10,000,000 in punitive damages.

By their tenth point of error, appellants complain that the verdict will not support the award of punitive damages to Joe Rodriguez.

By Special Issues 7 through 10, the court asked the jury about three statements Coors employees allegedly made about Rodriguez:

(1) that "Joe Rodriguez is a heavy gambler, bookie."

(2) that Joe Rodriguez had "paid two men last week $2,700.00 for losing a bet and that he had taken $4,000.00 from the distributor safe to go to Dallas and Houston to gamble on the baseball playoffs."

(3) that Joe Rodriguez "wasn't worth a shit" in the presence of his employees.

The jury found that Coors did publish these statements and that they were libelous or slanderous, that the statements were not true, that the publication was a proximate cause of damages to Rodriguez, and that Coors acted with malice.

However, the jury found $0.00 as the sum of money that would fairly and reasonably compensate Rodriguez for the above statements, but they assessed $1,000,000 as exemplary damages based on Coors' defamatory conduct toward Rodriguez.

Under Texas law, punitive damages are not recoverable in the absence of actual damages. Thus, generally, the recovery of actual damages is a prerequisite to the receipt of exemplary damages. *Nabours v.*

*Longview Savings & Loan Association*, 700 S.W.2d 901, 903 (Tex.1985); *Doubleday & Co. v. Rogers*, 674 S.W.2d 751, 753–54 (Tex.1984); *Garza v. San Antonio Light*, 531 S.W.2d 926, 930 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.).

Appellee contends that, because the law presumes the existence of some actual damages in cases involving libel per se, *see First State Bank v. Ake*, 606 S.W.2d 696, 702 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.), he need not secure a finding on the amount of actual damages in order to support his award of exemplary damages. However, libel per se merely allows the aggrieved party to go to the jury without the requirement of specific proof of the injurious character of the libelous statement. *City of Brownsville v. Pena*, 716 S.W.2d 677, 682 (Tex.App.—Corpus Christi 1986, no writ). It does not require the jury actually to find any amount of damages, which are within the jury's discretion, are purely personal, and cannot be measured by any fixed rule or standard. *Ake*, 606 S.W.2d at 702. Because the jury found that Rodriguez sustained $0.00 in actual damages as a result of the alleged defamation, Rodriguez's receipt of exemplary damages of $1,000,000 cannot stand. Appellants' tenth point of error is sustained.

In light of our holding on the above points of error, we need not address appellants' remaining points of error.

We REVERSE the judgment of the trial court and RENDER judgment that R & R and Rodriguez take nothing.