Opinion issued January 29, 2004










In The
Court of Appeals
For The
First District of Texas




NO. 01-01-00692-CV




C.M. ASFAHL AGENCY, Appellant

V.

TENSOR, INC.; QUALITY DRILLING TECHNOLOGY, INC.; QUANTUM
SOLUTIONS, INC.; AND ALLIED SIGNAL, INC., Appellees

* * *
TENSOR, INC.; QUALITY DRILLING TECHNOLOGY, INC.; AND QUANTUM
SOLUTIONS, INC., Appellants

V.

C.M. ASFAHL AGENCY, Appellee




On Appeal from the 129th District Court
Harris County, Texas
Trial Court Cause No. 98-39554




O P I N I O N

          Appellant and appellee, C.M. Asfahl Agency (the Agency), plaintiff below,
entered into sales and marketing agreements with appellants and appellees, Tensor,
Inc. (Tensor), Quality Drilling Technology, Inc. (QDT), and Quantum Solutions, Inc.
(QSI) (collectively, the Tensor parties), defendants below, which entities eventually
merged into a single Tensor entity.


 In 1998, appellee, Allied Signal, Inc. (Allied
Signal), also a defendant below, and Tensor executed an agreement by which Allied
Signal purchased the Tensor assets. Allied Signal maintained that, under the terms
of the asset-purchase agreement and because it had purchased only the Tensor assets,
the Agency no longer had any right to receive commissions under its sales and
marketing agreements with the Tensor parties. Asfahl


 disagreed and, through the
Agency, sued the Tensor parties, Allied Signal, George F. Roberts, a Tensor
principal, and Robert L. Waters, an Allied Signal principal.


 
          The Agency sought recovery for claims that included breach of the sales and
marketing agreements, tortious interference with those agreements by Allied Signal,
quantum meruit, violations of the Sales Representative Act,


 fraud, fraudulent
transfer, conspiracy, and indemnity. The trial court resolved most of these claims by
partial summary judgment before trial began or before the case was submitted to the
jury, either by directed verdict or refusal to include the Agency’s theories in the jury
charge. 
          The Tensor parties and Allied Signal did not present any evidence at trial and
rested after the Agency completed its case-in-chief. The case was submitted to the
jury under a breach-of-contract theory of liability. The jury found that the Tensor
parties failed to comply with the sales agreements with the Agency and awarded
$906,793.90 in actual damages for commissions due under the agreements,
$1,328,922.00 in attorney’s fees for preparation and trial, with additional awards of
$48,000.00 and $40,000.00 for appeals through the Texas courts. The trial court
rendered judgment on this verdict.


 In accordance with the jury’s finding that 28.6
percent of commissions due to the Agency were from wholesale sales, the trial court’s
judgment adjudicated the Tensor parties jointly and severally liable for an additional
$518,686.10 as trebled damages under the Sales Representative Act. 
          The Agency’s appeal presents six points of error that challenge the trial court’s
directing a verdict in favor of the Tensor parties and refusing to submit certain
damages issues to the jury, failing to treble all of the Agency’s damages for unpaid
commissions, directing a verdict in favor of Allied Signal on the Agency’s claim of
tortious interference with a contract, and rendering summary judgment against the
Agency on its fraudulent transfer and quantum-meruit claims. 
          The Tensor parties’ appeal presents six contentions, framed as “issues,” in
which they argue that (1) the trial court erred by permitting the jury to award the
Agency actual damages for commissions relating to certain sales, or (2), alternatively,
that the judgment of the trial court should be reformed because the evidence is
factually insufficient to support the damages awarded; (3) the treble damages awarded
to the Agency under the Sales Representative Act should be vacated; (4) the trial
court erred by admitting the Agency’s damages summary; and (5) the judgment of the
trial court should be reversed and the cause remanded because the evidence offered
to support the award of attorney’s fees did not segregate between recoverable and
non-recoverable claims, or (6), alternatively, the judgment should be reformed
because the fees awarded are excessive. 
          We overrule the Agency’s points of error. We sustain the Tensor parties’ issue
and overrule their remaining issues. We affirm in part and reverse and render in part. 
 

Background
          The Tensor parties manufactured magnetometers, which are highly specialized,
sophisticated components used in proximity-detection machinery for the oil and gas
industry. Engineers who formed Tensor in 1975 had developed the magnetometers
for use in its business. After Tensor began to sell its machines to other companies,
which incorporated the Tensor products into their own machinery and equipment,
Asfahl proposed marketing Tensor magnetometers to other companies. 
The Agency’s Sales Agreements with the Tensor Parties
          The Agency had sales agreements with each of the Tensor parties. The
Agency’s first agreement was with Tensor, in 1981. The agreement with QSI was in
1991, and the agreement with QDT was in 1993. Asfahl drafted each agreement
without legal assistance, and each agreement differs from the others. He referred to
“a book” when he drafted the later contracts, which he considered improvements over
the Agency’s first agreement with Tensor. 
          A.      Territory and Commissions
          The sales agreement with Tensor granted the Agency a 10 percent commission;
the QDT and QSI agreements provided the Agency a five percent commission. The
QDT agreement is the broadest of the three agreements, in that it is not limited to
specific companies and covers a territory broadly defined as consisting of the United
States, Canada, and Mexico, for which the Agency was granted exclusive commission
rights. Asfahl worked alone and had no sales associates. The Agency’s income from
the three agreements was substantial and totaled over $1.3 million in commissions in
1997 alone. 
          B.      “Continuity” Provisions
          Each of the three sales agreements included a provision that the parties refer
to as a “continuity” clause. Under the Agency’s agreement with Tensor, the “rights”
granted by the agreement endured “for such time as [the customer in question, as
named in the agreement] has active purchase orders or contracts accepted by Tensor,
Inc., plus an additional one and one-half years extending beyond the completion of
such purchase orders or contracts.” The agreement with QSI provides for a specific
term of “a period of ten years beginning 7 August 1991 and ending on 6 August
2001,” but could also be terminated by either party on 30 days’ notice. Although
Tensor continued to abide by the QSI agreement after Tensor merged with QSI, it is
undisputed that the QSI agreement terminated in 1998. Under the agreement with
QDT, which merged with Tensor in 1998, “[c]ommissions [would] cease to be paid
on orders . . . following a period of two years wherein no orders are accepted by QDT
from that customer or its successors.” 
          In addition to a “continuity” provision, each sales agreement contains a
provision that the agreement would be binding on the “successors and assigns” of the
Tensor parties. The Agency relied extensively on the “continuity” provisions in
claiming that it was entitled to future commissions even after the transfer of assets to
Allied Signal. The Agency also relied on the “successors and assigns” terms, as well
as the time-period designations in each of the sales agreements, to support the
Agency’s claim that the Tensor parties’ obligations to the Agency continued, even
though the Tensor parties ceased to exist after Allied Signal purchased their assets. 
                  March 31, 1998 Asset Purchase of Tensor by Allied Signal
          Allied Signal manufactured instruments that Tensor used in its products. In
1996, Allied Signal began efforts to purchase Tensor’s assets. A major difference
between the two companies was that Allied Signal did not employ independent sales
agents like Asfahl to market its products and relied instead on in-house employees
who were either salaried or earned substantially smaller commissions than the
Agency earned under the sales agreements with the Tensor parties. 
          Allied Signal acquired Tensor’s assets by an asset-purchase agreement (APA)
entitled “Agreement and Plan of Reorganization.” The purchase price exceeded $40
million, and the APA was executed on March 31, 1998.


 Specific provisions of the
APA excluded Tensor assets from the assets Allied Signal purchased. Other
provisions of the APA specified liabilities and obligations that Allied Signal assumed
in the purchase. Allied Signal and Tensor also executed a separate assumption
agreement for the liabilities assumed by the APA. 
          A.      Assets Excluded by APA 
          Paragraph 2.2 of the APA governed “Excluded Assets.” (Emphasis in
original.) This paragraph addressed specific Tensor assets that were not conveyed to
Allied Signal. Subparagraph (b) of paragraph 2.2 lists, “Those certain Sales
Agreements (the “Asfahl Agreements”)” and deems them an “Excluded Asset.” 
(Emphasis in original.) The “Agency Agreements” stand out in their specificity, in
that the only other Tensor assets listed as excluded are (1) retained cash, subject to
provisions of the APA governing final adjustment on the transaction, and (2) the
corporate minute book, stock transfer records, and other documents and records of
Tensor and its subsidiaries that were not related to the business. 
          B.      Liabilities Assumed by APA
          Paragraph 4.1 of the APA, entitled “Assumption of Certain Liabilities and
Obligations by Purchaser,” governed any liabilities of the Tensor parties that Allied
Signal, as purchaser, expressly agreed to “ assume, promise to pay, and be liable and
responsible solely for” in the asset-purchase transaction. (Emphasis in original.) 
Paragraph 4.1 contains two provisions that are relevant to this lawsuit, as follows:
[4.1.](d)[The Tensor parties’] obligations and liabilities
relating to periods on or after the Closing Date
under the Contracts listed in the Contracts Schedule
and Real Property Schedule attached hereto. 
Purchaser will not assume any Contract with an
obligation exceeding $100,000 that is not listed on
the Contracts Schedule. 

          . . . .
 
[4.1](f)[The Tensor parties’] obligations to pay
commissions to Asfahl to the extent accrued or
reserved for on the Closing Balance Sheet. 

(Underlined emphasis in original; bolded emphasis added.)

          The APA’s Supplement to the Contracts Schedule referred to in paragraph
4.1(d) above lists the sales agreements with the Agency. Under the terms of the
separate assumption agreement executed concurrently with the APA, Allied Signal
agreed to “pay, perform and discharge promptly and fully when due” the liabilities
assumed under the APA.
          C.      APA Disclaimed Third-Party Rights
          Paragraph 17.14 of the APA, entitled “Third Party Rights,” disclaimed any
rights inuring to others as a result of the APA. Under this paragraph, the provisions
of the APA “are for the sole benefit of Purchaser (Allied Signal) and Seller (Tensor)
. . . and shall not enure [sic] to the benefit of any other entity or person . . . either as
a third[-]party beneficiary or otherwise.”
          D.      Contentions of the Parties 
          Although paragraph 2.2(b) of the APA explicitly listed the Agency’s sales
agreements as “excluded assets,” and although neither Asfahl nor the Agency was a
party to the APA, the Agency claimed that both the APA and the terms of the sales
agreements entitled the Agency to continuing commissions after Allied Signal
purchased Tensor’s assets. The Tensor parties and Allied Signal argued that the
provisions of the APA excerpted above disclaimed any continuing obligation to pay
commissions to the Agency. The Tensor parties also argued that, because their
entities and, therefore, their products, ceased to exist after March 31, 1998, the date
of the asset purchase, and because they consequently received no payments of any
kind after that date, they had no further obligation to the Agency after that date. 
Allied Signal and the Tensor parties also contended that their interpretation of the
APA, which they alone executed, was consistent with article 5.10(B)(2) of the
Business Corporation Act, which provides that a disposition of the assets of a
corporation does not make the acquiring entity “responsible or liable for any liability
or obligation of the selling corporation” that the acquiring entity “did not expressly
assume.” Tex. Bus. Corp. Act. Ann. art. 5.10(B)(2) (Vernon Supp. 2004).
 

Verdict and Judgment
          The trial court submitted the Agency’s case to the jury by a single liability
question that inquired whether “any of the Tensor parties fail[ed] to comply with the
agreement to pay Charles Asfahl commissions under the sales agreements in
question.” Having answered “yes” to this question, the jury then determined “what
sum of money, if any, . . . would fairly and reasonably compensate Charles Asfahl for
his damages, if any, that resulted from [the Tensor parties’] failure to comply.” 
Pursuant to the instruction that accompanied this question, the jury was to limit any
award to “unpaid commissions, if any, for the time period from July 20, 1994



through orders received by the Tensor parties on or before March 31, 1998.”


 The
parties and the trial court referred to these damages as “gap” damages or “gap
commissions,” whose purpose was to compensate the Agency for sales generated
before the asset purchase. 
          The trial court’s limiting liability and damages to gap commissions due to the
Agency, and no commissions beyond gap commissions, i.e., beyond the sale of
Tensor’s assets to Allied Signal, is consistent with the trial court’s stated intent to
“submit to the jury . . . a question that encompasses orders made prior to the asset[-]
purchase agreement.” (Emphasis added.) Limiting liability and damages to gap
commissions is also consistent with the trial court’s having directed a verdict against
the Agency “for all claims for commissions subsequent to the asset[-]purchase
agreement [and] for all sales of products made after the asset[-]purchase date.” 
(Emphases added.) By directing a verdict against the Agency for post-APA
commissions and sales, and thus limiting the Agency’s damages to gap commissions,
the trial court eliminated any claim of a continuing obligation to the Agency under
the sales agreements.
The Agency’s Challenges to Directed Verdict and to Jury Charge Limiting
Damages for Unpaid Commissions to Orders Tensor Received before Asset-Purchase Date

          In its first two points of error, the Agency contends that the trial court erred by
granting a directed verdict and refusing to submit issues to the jury for post-APA
damages. In the first point of error, the Agency contends that Allied Signal expressly
assumed the Tensor parties’ commission obligations to the Agency and alternatively,
in the second point of error, contends that the APA did not terminate the Tensor
parties’ commission obligations. We address these points together.


 
          A directed verdict is proper in the following circumstances: (1) a defect in the
opponent’s pleading renders that pleading insufficient to support a judgment; (2) the
evidence conclusively proves facts that establish the movant’s right to judgment
under the substantive law; or (3) the evidence is legally insufficient to raise a fact
issue on a proposition that the nonmovant must establish to be entitled to judgment. 
Smith v. Radam, Inc., 51 S.W.3d 413, 417 (Tex. App.—Houston [1st Dist.] 2001, no
pet.). A directed verdict is properly rendered in favor of a defendant when the
plaintiff does not present evidence that raises a fact issue essential to the plaintiff’s
right of recovery or when the plaintiff admits or the evidence conclusively establishes
a defense to the plaintiff’s cause of action. Prudential Ins. Co. v. Fin. Review Servs.,
29 S.W.3d 74, 77 (Tex. 2000). Well-settled standards require that we review a
directed verdict in the light most favorable to the party who suffered the ruling and
disregard all contrary evidence and inferences. See Qantel Bus. Sys., Inc. v. Custom
Controls Co., 761 S.W.2d 302, 303-04 (Tex. 1998); Smith, 51 S.W.3d at 417. 
          We apply a similar standard to the Agency’s complaint that the trial court erred
by refusing to submit damages questions to the jury for post-APA damages. Rule 278
requires trial courts to submit broad-form questions raised by the “pleadings and
evidence.” Tex. R. Civ. P. 278; Elbaor v. Smith, 845 S.W.2d 240, 243 (Tex. 1992). 
If a controlling issue is timely raised by pleadings and evidence and properly
requested to be included in the charge, refusal to submit a valid theory of recovery or
a valid defense may constitute reversible error. Exxon Corp. v. Perez, 842 S.W.2d
629, 631 (Tex. 1992). Whether legally sufficient evidence supports submitting a
theory of recovery to the jury presents a question of law that we review de novo based
on the pleadings, the evidence and the charge as a whole. See Elbaor, 845 S.W.2d
at 243. 
          To the extent that the Agency’s issues require interpretation of the sales
agreements and the APA, we interpret these contracts as a matter of law under
established rules of interpretation. See Coker v. Coker, 650 S.W.2d 391, 393-94
(Tex. 1983) (recognizing that court properly construes written instrument as a matter
of law if it can be given a certain or definite meaning and is therefore not ambiguous;
further holding that existence of ambiguity is question of law); Forbau v. Aetna Life
Ins. Co., 876 S.W.2d 132, 133-34 (Tex. 1994) (requiring that court construing
contract give effect to all provisions and that specific provisions control over more
general provisions). 
          Our analysis of these issues necessarily begins by recognizing the type of
transaction by which Allied Signal acquired the entities of the Tensor parties. This
transaction was an asset transfer, as opposed to a stock transfer, and thus governed
by Texas law authorizing a successor to acquire the assets of a corporation without
incurring any of the grantor corporation’s liabilities unless the successor expressly
assumes those liabilities. The Business Corporation Act provides as follows: 
A disposition of any, all, or substantially all, of the property and assets
of a corporation . . . except as otherwise expressly authorized by another
statute, does not make the acquiring corporation, foreign corporation, or
other entity responsible or liable for any liability or obligation of the
selling corporation that the acquiring corporation, foreign corporation,
or other entity did not expressly assume.

Tex. Bus. Corp. Act. Ann. art. 5.10(B)(2) (Vernon 2003). See Suarez v. Sherman
Gin Co., 697 S.W.2d 17, 20-21 (Tex. App.—Dallas 1985, writ ref’d, n.r.e.)
(contrasting stock and asset-purchase cases decided under pre-article 5.10(B)(2) law);
see also Lockheed Martin Corp. v. Gordon, 16 S.W.3d 127, 139-40 (Tex.
App.—Houston [1st Dist.] 2000, pet. denied) (“Texas strongly embraces the non-liability rule.”). Even if the Agency’s sales and marketing agreements with the
Tensor parties purported to bind their “successors and assigns,” therefore, the
agreements could not contravene the protections that article 5.10(B)(2) afforded
Allied Signal in acquiring the assets of the Tensor parties unless Allied Signal 
expressly agreed to be bound by the Tensor parties’ agreements with the Agency. 
          According to paragraph 2.2 of the APA, assets identified as excluded were “not
intended to be sold, assigned, transferred or conveyed” to Allied Signal. (Emphasis
added.) Paragraph 2.2(b) of the APA identifies the Agency sales agreements as
“excluded” from the Tensor assets transferred to Allied Signal. In addition to
benefitting the Agency, sometimes to the extent of a 10 percent commission, the sales
agreements necessarily benefitted the Tensor parties and were thus properly
considered “assets.” Because the APA excluded the Agency agreements as assets
transferred to Allied Signal and also expressly disclaimed assignment of those
agreements, Allied Signal could not obtain any post-APA benefit that had previously
accrued to the Tensor parties from the Agency’s marketing. In contrast to the trial
court, we discern no preliminary “conflict” between considering the sales agreements
with the Agency as both “assets” and “liabilities.”


 
          Moreover, paragraph 4.1(f) of the APA is also very specific, in two respects,
concerning the sales agreements that Allied Signal assumed. Although paragraph
4.1(f) recognizes liabilities to the Agency as assumed liabilities, paragraph 4.1(f)
limits Allied Signal’s responsibility to commissions “accrued or reserved for on the
Closing Balance Sheet” for the asset-purchase transaction. (Emphasis added.) This
limitation recognizes continuing liability for commissions due to the Agency for sales
generated up to the March 31, 1998 asset transfer to Allied Signal. Acknowledging
these gap commissions is also consistent with the reality of how the Tensor parties’
sales were completed. It is undisputed that significant time frequently elapsed
between the Agency’s initially placing orders for buyers that the Agency supplied and
the Tensor parties’ finally completing those orders because the machines that the
Tensor parties produced were typically customized to meet buyers’ differing, specific 
requirements. Considerable delay often resulted, therefore, between the Agency’s
placing orders for machinery with the Tensor parties and actual invoicing of those
orders by the Tensor parties.


 
          The Agency’s arguments minimize the importance of paragraph 4.1(f) and
focus instead on paragraph 4.1(d) of the APA. Paragraph 4.1(d) recognizes
obligations “relating to periods on or after the Closing Date under the Contracts listed
in the Contracts Schedule” as assumed liabilities. (Emphasis added.) The Agency
also relies on an amendment to the Contracts Schedule, which identifies the sales
agreements. The Agency contends that the broad reference to periods beyond the
closing date, taken together with the specific listing of the sales agreements in the
contract schedule, compel the conclusion that the obligations under the sales
agreements continued after Allied Signal’s purchase of the Tensor entities. 
          We agree with the trial court that the express, specific limitation in paragraph
4.1(f) for “obligations to pay commissions to Asfahl to the extent accrued or reserved
for on the Closing Balance Sheet” is, under well-settled rules of contract
interpretation, a specific provision that controls over the more general recognition of
“after the Closing Date” obligations in paragraph 4.1(d). See Forbau, 876 S.W.2d at
133-34. Despite perceiving a conflict between listing the Agency agreements as both
an asset and a liability, the trial court relied extensively on the “specific controls the
general” rule of contract interpretation in concluding that paragraph 4.1(f)’s
restriction to “accrued” obligations, or those reserved for on the closing balance
sheet, controlled over the post-closing date recital in paragraph 4.1(d). Thus, the trial
court concluded, and we hold, that paragraph 4.1(d) of the APA did not permit the
Agency to recover for post-APA sales. 
          We construe paragraphs 4.1(d) and 4.1(f) of the APA as consistent with the
Tensor parties’ and Allied Signal’s having expressly excluded the Agency agreements
as profit-producing assets transferred to Allied Signal pursuant to paragraph 2.2(b). 
Taken together, paragraphs 4.1(d) and (f) reflect that the Tensor parties and Allied
Signal acknowledged the delay, or “gap,” that undisputedly occurred between the
Agency’s placing an order from a sale that the Agency generated and payment for the
product by the customer, after which the Agency would receive a commission. 
          Paragraphs 4.1(d) and (f) likewise acknowledge that Tensor ceased to exist
after the asset-purchase transfer to Allied Signal. Having transferred its assets and
having committed to wind up its affairs, Tensor would have no free assets to
compensate the Agency for gap commissions due. Liabilities to the Agency for gap
commissions, however, necessarily continued. As gap commissions became due for
payment to the Agency, they would (1) necessarily be reflected in Tensor’s
accounting and would thus be shown as “accrued or reserved for” on the closing
balance sheet, but also (2) necessarily be reflected as a contract for which obligations
were due after the closing date under paragraph 4.1(d) and thus listed in the contracts
schedule, as the Agency agreements were. 
          Consistent with the Agency agreements’ having been excluded as acquired
assets, Allied Signal’s liability to “assume, promise to pay, and be liable and
responsible for” the Tensor parties’ obligations, was necessarily a limited liability. 
Specifically, Allied Signal agreed to pay gap commissions owed to the Agency for
sales that were generated up to March 31, 1998, the date of the asset purchase, and
were thus reflected as due to the Agency on the closing balance sheet, but which
would not have been paid by the Tensor customer by that date and would thus reflect
a commission due to the Agency after that date. 
          The Assumption Agreement, which Allied Signal executed in favor of the
Tensor parties as part of the March 31, 1998 asset purchase, does not change this
analysis because the liabilities assumed are those encompassed by the entirety of
paragraph 4.1, which necessarily includes paragraph 4.1(f)’s narrow limitation of
liabilities assumed to those “accrued or reserved for on the Closing Balance Sheet.” 
Likewise, we are not persuaded that the testimony of Cynthia Bast, Allied Signal’s
attorney for the asset-purchase transaction, compels a different interpretation of the
contract than we have reached here. According to Bast, the “on or after the Closing
Date” provisions of paragraph 4.1(d), taken together with the listing of the Agency
agreements as an addendum to the contracts schedule, created an assumption of
liability for the Agency agreements after March 31, 1998. This testimony isolates
these two provisions and thus does not encompass, as the trial court did, and we must,
the entirety of the APA. Accordingly, Bast’s testimony did not give rise to a disputed
issue of fact to defeat the Tensor parties’ and Allied Signal’s right to a directed
verdict limiting any damages due to the Agency to orders Tensor received before the
asset-purchase transaction. 
          We overrule the Agency’s first and second points of error. 
TSRA Treble Damages—Challenges by the Agency and the Tensor Parties



          In its third point of error, the Agency challenges two rulings by the trial court
under the Sales Representative Act (TSRA), Tex. Bus. & Com. Code Ann. §§ 35.81-86 (Vernon 2002). The Tensor parties also challenge the trial court’s TSRA rulings. 
The Agency contends that it is entitled to trebling on all damages, rather than a mere
percentage of damages, because all of its sales were “wholesale” sales. In their third
issue, the Tensor parties contend that trebling is improper as a matter of law because
there is no evidence that the Agency had any “wholesale” sales. We address the
Agency’s and the Tensor parties’ contentions together.
          TSRA was enacted to protect “sales representatives.” Metromarketing Servs.,
Inc. v. HTT Headwear, Ltd., 15 S.W.3d 190, 195 (Tex. App.—Houston [14th Dist.]
2000, no pet.).


 It is undisputed that the Tensor parties were “principals” within the
meaning of the TSRA: they (1) manufactured products for sale, (2) used the Agency
as their commissioned sales agent to solicit orders for those products, and (3)
compensated the Agency by paying commissions. See Tex. Bus. & Com. Code Ann.
§ 35.81(2)(A)-(C). Although no one contests that the Agency was a commissioned
sales agent for the Tensor parties, the parties vigorously dispute whether the Agency
was entitled to recover under the treble-damages provisions of TSRA. 
          TSRA defines “sales representative” as an independent contractor who solicits
orders on behalf of a principal for wholesale purchase of the principal’s product. See
Tex. Bus. & Com. Code Ann. § 35.81(3). Section 35.84 permits a sales
representative to recover three times the amount of unpaid commissions, plus
attorney’s fees and costs, if the principal fails to comply with a contract, under section
35.82, or fails to pay a commission, as required by section 35.83. Tex. Bus. & Com.
Code Ann. § 35.84. Section 35.84 provides as follows:
A principal who fails to comply with a provision of a contract under
Section 35.82 relating to a payment of a commission or fails to pay a
commission as required by Section 38.83 is liable to the sales
representative in a civil action for three times the unpaid commission
sustained by the sales representative plus reasonable attorney’s fees.

Tex. Bus. & Com. Code Ann. § 35.84. The trial court submitted the TSRA issue to
the jury in question 3 of the court’s charge. 
          In response to question 2 of the charge, the jury assessed $906,793.90 as
damages for the Tensor parties’ failure to comply with the sales agreements with the
Agency. Question 3 of the charge directed the jury to answer the following if an
amount of damages were awarded in response to question 2:
What percentage of the amount that you found in answer to Question
No. 2 were commissions from wholesale sales?
 
“Wholesale” is the sale of goods in quantity for resale, either separately
or as a component.



 
Answer by stating a percentage: ___.

The jury answered, “28.6%.”

          In accordance with the 28.6 percentage found by the jury, the judgment of the
trial court awarded the Agency $518,686.10 as trebled damages pursuant to section
35.84 of TSRA. The Agency challenges the trial court’s refusal to set aside the jury’s
28.6 percentage finding and the trial court’s resulting refusal to treble the entire
$906,793.90 amount that the jury awarded in response to question 2. The Tensor
parties contend that section 35.84 does not apply and that trebled damages were
improper as a matter of law. 
A.      The Agency’s Challenge
          The Agency contends that, despite the jury’s answer to question 3, it is entitled
to trebling on the entire $906,793.90 awarded by the jury as damages in response to
question 2. The Agency premises its appellate contention on two rulings by the trial
court. In the first ruling, the trial court refused to set aside, as immaterial, the jury’s
finding, in response to question 3, that 28.6 percent of the damages that the jury
awarded were attributable to wholesale sales. In accordance with that ruling, the trial
court entered the second challenged ruling, which overruled the Agency’s motion
seeking entry of a judgment awarding trebled damages on the entire $906,793.90
awarded by the jury for the Tensor parties’ failure to comply with the sales
agreements. Because the second ruling necessarily followed the first ruling, we
construe the Agency’s third point of error as a challenge to the trial court’s refusal to
set aside the jury’s answer to question 3 on the grounds of immateriality.
          A trial court may disregard a jury finding only if it should not have been
submitted or it is immaterial. Southeastern Pipe Line Co. v. Tichacek, 997 S.W.2d
166, 172 (Tex. 1999). A jury finding is immaterial when the question to which the
finding responds (1) should not have been submitted, (2) calls for a finding beyond
the province of the jury, such as a question of law, or (3), was properly submitted, but
the jury’s answers to other questions render the finding meaningless. See id. 
          The Agency asserts that the TSRA mandates trebling of any damages awarded
for unpaid commissions as a matter of law, regardless of whether the commissions
were attributable to wholesale sales, and that the trial court should, therefore, have
(1) granted the Agency’s motion to disregard the jury’s finding that 28.6 percent of
the Agency’s commissions were attributable to wholesale sales and (2) should have
granted the Agency’s motion seeking trebled damages for all unpaid commissions. 
In moving to set aside the jury’s finding that 28.6 percent of the damages awarded
were from “wholesale sales,” the Agency argued that the finding was immaterial and
that question 3 “should never have been submitted to the jury” because any
percentage allocation to wholesale sales was irrelevant and invaded determination of
the legal question that the Agency was entitled to trebling on all damages as a matter
of law. The Agency thus contends that the trial court, rather than the jury, should
have determined the TSRA issue. Accordingly, the Agency’s challenge to the trial
court’s failure to set aside the jury’s finding of 28.6 percent wholesale sales falls into
the first and second categories of immateriality. See id.
          To preserve a complaint premised on the jury charge for appellate review, a
party must, at the risk of waiver, (1) present to the trial court a timely request, motion,
or objection; (2) state the specific ground; and (3) obtain a ruling. Tex. R. App. P.
33.1(a); see In re B.L.D., 113 S.W.3d 340, 349 (Tex. 2003).


 Requiring parties to
preserve error conserves judicial resources, by allowing the trial court to correct an
error before an appeal proceeds, and promotes fairness among litigants. In re B.L.D.,
113 S.W.3d at 350 (citing and quoting from Pirtle v. Gregory, 629 S.W.2d 919, 920
(Tex. 1982)); see also id. at 354 (rejecting contention that due process concerns
compel court of appeals to address unpreserved error in termination of parental-rights
cases); In re A.V., 113 S.W.3d 355, 358 (Tex. 2003) (confirming same). 
          A party fails to preserve error in the jury charge when that party waives, or
invites, the alleged error by acquiescing to submitting a theory that the party later
claims is erroneous. See 34 T. Ray Guy, The Jury Charge in Texas Civil
Litigation: Texas Practice Series § 9.27 at 147 (3d ed. 2003). Similarly, a party
waives claimed error in the charge when that party proposes to submit a substantially
similar charge to the jury. See Maddox v. Denka Chem. Corp., 930 S.W.2d 668, 670
(Tex. App.—Houston [1st Dist.] 1996, no writ); Winkle v. Tullos, 917 S.W.2d 304,
316 (Tex. App.—Houston [14th Dist.] 1995, writ denied); see also Williams v.
Vought, 68 S.W.3d 102, 115 (Tex. App.—Dallas 2001, no pet.) (following Maddox
and holding same). 
          Despite postverdict complaints that question 3 should never have been
submitted to the jury at all and that the trial court should have awarded treble
damages on the entire $906,793.90 as a matter of law, the Agency did not object to
question 3, which asked the jury to determine the percentage of wholesale sales. 
Instead, the Agency merely lodged a three-pronged objection to the definition of
“wholesale” within the question.


 The essence of these objections is that, although
the Agency objected to the court’s defining “wholesale” for the jury, the Agency did
not object to submitting the question itself and thus acquiesced to asking the jury to
determine the percentage of wholesale sales. In sharp contrast to its postverdict
contention that question 3 should never have been submitted, the Agency did not
oppose and actually embraced, as explained below, the jury’s determining the
percentage of wholesale sales, although the Agency would have preferred a different
definition of “wholesale” or no definition at all. 
          The record reflects that the Agency strongly favored submitting TSRA issues
to the jury, albeit in a different manner than that chosen by the trial court. The
Agency proposed to submit the TSRA issues to the jury by a single question that
would have asked the jury to determine whether the Agency was a “sales
representative” for either the Tensor parties or Allied Signal. But the Agency’s
tendered question, which the trial court marked “refused,” would also have required
the jury to determine whether the Agency made wholesale sales. An instruction
accompanying the Agency’s proposed question would have defined “sales
representative” as follows: “‘Sales representative’ means an independent contractor
who solicits[,] on behalf of a principal[,] orders for the purchase at wholesale of the
principal’s product.” (Emphasis added.) Under both the charge as submitted and the
charge proposed by the Agency, therefore, the jury would determine the underlying
issue of wholesale sales. Having proposed that the jury determine the issue of
wholesale sales, the Agency could neither properly ask the trial court to disregard the
jury’s finding as immaterial nor properly contend that the jury should never have been
asked to determine that issue. See Maddox, 930 S.W.2d at 671. For the same
reasons, the Agency may not assert those challenges on appeal. See id.
          We conclude that the Agency did not preserve error because the Agency did
not timely assert any challenge to the court’s charge, which allowed the jury to
determine what percentage of the Agency’s sales were attributable to wholesale sales,
and therefore waived any error pertaining to either the trial court’s denying the
Agency’s motion to disregard the jury’s finding as immaterial or the Agency’s motion
seeking entry of a judgment trebling all damages. 
          We overrule the Agency’s third point of error.
 

B.      The Tensor Parties’ Challenge
          In their third issue, the Tensor parties contend that TSRA’s treble-damages
provision, section 35.84, applies only to wholesale sales. They argue that there is no
evidence that the Agency made any wholesale sales and that trebling was improper
as a matter of law. They ask that we vacate the treble-damages award of $518,686.10. 
Well-settled standards govern our standard and scope of review of the Tensor parties’
“no-evidence” challenge. E.g., Lenz v. Lenz, 79 S.W.3d 10, 19 (Tex. 2002);
Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 24-25 (Tex. 1994).
          A legal-sufficiency challenge may be preserved by a motion for directed
verdict, a motion for judgment notwithstanding the verdict, an objection to submitting
an issue to the jury, a motion to disregard a jury finding on an issue, or a motion for
new trial. See Cecil v. Smith, 804 S.W.2d 509, 511 (Tex. 1991).


 Here, the Tensor
parties preserved their challenge in their post-verdict motion for judgment
notwithstanding the verdict, in which they challenged the legal sufficiency of the
evidence to support recoverability of treble damages under question 3 of the jury
charge. See Holland v. Wal-Mart Stores, 1 S.W.3d 91, 94 (Tex. 1999) (holding that
postverdict motion for judgment notwithstanding the verdict preserved error because
objecting party challenged recoverability of attorney’s fees under legal theory
submitted to jury). 
          As addressed above, question 3 of the court’s charge asked the jury “what
percentage”of damages awarded for the Tensor parties’ failure to comply with the
sales agreement was attributable to wholesale sales, which the charge defined as, “the
sale of goods in quantity for resale, either separately or as a component.” Although
Asfahl described all of his sales as “wholesale,” his testimony does not encompass
evidence that the sales he described met both components of the “wholesale”
definition, specifically, that the sales were made (1) in quantity and (2) for resale. 
The voluminous records of the Agency’s sales do indicate some sales in quantity;
likewise, some records reflect sales for resale. But, the record before us contains no
evidence that the Agency commissioned sales for the Tensor parties that qualified as
both (1) in quantity and (2) for resale. Because there was no evidence of wholesale
sales, as defined by the jury charge, we hold that the trial court erred by denying the
Tensor parties’ motion for judgment notwithstanding the verdict, which challenged
the jury’s finding that 28.6 percent of damages were for wholesale sales. That finding
should have been set aside and the $518,686.10 awarded by trial court’s judgment as
treble damages in accordance with that finding must also be set aside.
          We sustain the Tensor parties’ third issue.
Fraudulent Transfer Claim against the Tensor Parties and Allied Signal
          In its fifth point of error, the Agency contends that the trial court erred by (1)
rendering summary judgment in favor of the Tensor parties and Allied Signal on the
Agency’s claim that the Tensor parties’ sale of its assets constituted a fraudulent
transfer that violated the Uniform Fraudulent Transfer Act (UFTA) and (2) refusing
to submit that claim to the jury. See Tex. Bus. & Com. Code Ann. §§ 24.001-.013
(Vernon 2002). We decline to address the latter contention because the record does
not show that the Agency proposed submitting a fraudulent-transfer question to the
jury. We therefore limit our review to the summary judgment granted on the Tensor
parties’ and Allied Signal’s joint motion for summary judgment, which became
merged with the final judgment challenged here. See Newco Drilling Co. v. Weyand,
960 S.W.2d 654, 656 (Tex. 1998); State Farm Fire & Cas. Co. v. Griffin, 888 S.W.2d
150, 153 (Tex. App.—Houston [1st Dist.] 1994, no writ); City of Houston v. Socony
Mobil Oil Co., 421 S.W.2d 427, 430 (Tex. App.—Houston [1st Dist.] 1967, writ
ref’d, n.r.e.). Our scope of review is limited to the summary-judgment record upon
which the trial court based its ruling, see Griffin, 888 S.W.2d at 153, and we review
the summary judgment according to well-settled standards. See Tex. R. Civ. P.
166a(c); Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985). 
           UFTA proscribes certain transfers by a “debtor,” which the act defines as “a
person who is liable on a claim.” Tex. Bus. & Com. Code Ann. § 24.002(6). The
purpose of UFTA is to prevent debtors from placing property beyond the reach of
creditors with intent to defraud those creditors. Tel. Equip. Network, Inc. v.
TA/Westchase Place, Ltd., 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, 
no pet.). UFTA creates a statutory cause of action by which an aggrieved creditor
may seek recourse for fraudulent transfer of assets. Id. A transfer by a debtor may
be fraudulent as to either a present or future creditor if the debtor made the transfer
or incurred the obligation:
(1)with actual intent to hinder, delay, or defraud any creditor of the
debtor; or
 
(2)without receiving a reasonably equivalent value in exchange for
the transfer or obligation . . . .

Tex. Bus. & Com. Code Ann. § 24.005(a)(1)-(2). The Agency’s pleadings alleged
that the asset purchase by which Allied Signal acquired the assets of the Tensor
parties violated both prongs of section 24.005(a). The summary-judgment record
indicates that, in moving for summary judgment, the Tensor parties and Allied Signal
relied on the terms of the APA and the affidavits of their respective principals. 
          As addressed in our analysis of the Agency’s first and second points of error
and as demonstrated by the summary-judgment record, Allied Signal acquired the
assets of the Tensor parties pursuant to the APA and in accordance with article
5.10(B)(2) of the Business Corporation Act. See Tex. Bus. Corp. Act Ann. art.
5.10(B)(2). The APA excluded the Agency agreements from the assets transferred
to Allied Signal and expressly disclaimed assignment of those agreements to Allied
Signal. Because the Tensor parties ceased to exist after their assets were transferred
under the APA, the Agency had no right to future commissions from the Tensor
parties, despite the “continuity” provisions of the sales agreements. Because the APA
excluded the Agency agreements from the assets Allied Signal acquired, the Agency
had no right to future commissions from Allied Signal. The summary-judgment
record established, as we have also held above, that the Agency was not a “future”
creditor as to either Allied Signal or the Tensor parties as a matter of law. The
Agency’s status was thus limited to that of a “present” creditor and any recovery was
limited to “gap” commissions that remained unpaid as of the date of the asset
purchase. 
          In moving for summary judgment on the Agency’s claim that the transfer of the
Tensor parties’ assets to Allied Signal violated UFTA section 24.005(a)(1) because
it was with made to avoid paying commissions that were owed to the Agency and thus
with actual intent to hinder, delay, or defraud the Agency, Allied Signal and the
Tensor parties contended that the question of fraudulent intent presented a question
of law in this case. See Connell v. Connell, 889 S.W.2d 534, 542 (Tex. App.—San
Antonio 1994, writ denied) (holding that courts may resolve issue of fraudulent intent
as a matter of law when evidence establishes that conveyance was not made with
fraudulent intent and no evidence tends to connect grantee with any intent to
defraud). We agree. 
          In addition to relying on the terms of the APA, none of which discloses or
suggests a fraudulent intent, the Tensor parties and Allied Signal provided sworn and
documentary proof that disclaimed all but one of the factors, or “badges of fraud,”
listed in section 24.005 as possible indicators of fraudulent intent by a debtor. See
Tex. Bus. & Com. Code Ann. § 24.005(b)(1)-(11); Tel. Equip. Network, 80 S.W.3d
at 607.


 The Tensor parties and Allied Signal emphasized that the negotiated
purchase price for the transfer of net assets far exceeded the amount of any
commissions owed to the Agency and further emphasized that Allied Signal expressly
assumed the Tensor parties’ obligation to pay commissions due to the Agency “to the
extent accrued or reserved for” on closing. Allied Signal and the Tensor parties
conceded the fifth factor listed in section 24.005(b), that the assets transferred
constituted all Tensor assets, but contended that this factor did not give rise to any
triable issue of fact on fraudulent intent because the transfer was statutorily
authorized, completely within the law, and an undisputedly frequent business
occurrence. 
          Aside from other legal contentions that did not dispute the Tensor parties’ and
Allied Signal’s entitlement to summary judgment as a matter of law under UFTA
section 24.005(a)(1), the Agency’s response in the trial court focused, as here, on the
contention that the Tensor parties never received the negotiated consideration for the
asset-purchase because the purchase price was paid to their shareholders in the form
of stock certificates. The Agency contends that this left the Tensor parties in the
status of a creditor that had passed funds through to others to avoid payment. 
          The Agency’s perception of the transaction ignores several aspects of the asset-purchase transaction that contemplate Allied Signal’s and the Tensor parties’
recognition of pending obligations. All of these aspects are reflected on the face of
the APA. First, the APA indicates payment to the Tensor parties, despite ultimate
transfer of stock certificates to the shareholders. In addition, the stated purpose of the
transaction was a “C Reorganization” that would completely liquidate the Tensor
parties and thus, appropriately, leave it ultimately empty of assets. Next, the
Agency’s contention that the transfer left the Tensor parties bereft of assets with
which to pay commissions due ignores that the stock certificates transferred to
shareholders represented the Tensor parties’ “net” assets. The Business Corporation
Act defines “net” assets as “the amount by which the total assets of a corporation
exceed the total debts of the corporation.” Tex. Bus. Corp. Act Ann. art.
1.02.A.(19) (Vernon 2003). (Emphasis added.) The APA thus recognized the Tensor
parties’ obligation for debts not expressly assumed by Allied Signal. In similar
manner, the APA compelled Tensor to “work to settle its affairs” following the
closing of the sale, which would necessarily contemplate paying debts. Finally,
Allied Signal expressly assumed liability under the APA to pay commissions due to
the Agency to the extent accrued or reserved for on the closing balance sheet. 
          We conclude that the summary judgment record establishes that the Agency
raised no triable fact issues to defeat the Tensor parties’ and Allied Signal’s
entitlement to summary judgment as a matter of law against the Agency’s claim that
the asset-purchase was a fraudulent transfer under section 24.005(a)(1) of UFTA. 
          Concerning the Agency’s allegations that the asset-purchase was a fraudulent
transfer under section 25.005(a)(2) because the Tensor parties did not receive
reasonably equivalent value, the Agency did not dispute that Allied Signal paid over
$40 million to acquire the Tensor parties’ assets, but again relied on the stock
certificates ultimately issued to the Tensor parties’ shareholders. In opposing
summary judgment, the Agency argued that the stock certificates issued to
shareholders raised a triable issue of fact concerning whether the Tensor parties
received reasonably equivalent value in exchange for transferring their assets to
Allied Signal. For the same reasons stated in rejecting the Agency’s challenge to the
summary judgment in favor of the Tensor parties and Allied Signal on the Agency’s
claim of fraudulent transfer under section 24.005(a)(1) of UFTA, we reject the
Agency’s reliance on the certificates here. We hold that the trial court properly
rendered summary judgment against the Agency on its section 24.005(a)(2) claim. 
          We overrule the Agency’s fifth point of error.
Tortious Interference Claim against Allied Signal 
          In its fourth point of error, the Agency contends that the trial court erred by
directing a verdict in favor of Allied Signal on the Agency’s claim that Allied
Signal’s purchase of the Tensor parties’ assets constituted a tortious interference with
the Agency’s sales agreements with the Tensor parties. The standard of review for
a directed verdict rendered in favor of a defendant, which we applied in addressing
the Agency’s’s first point of error, also controls this challenge. See Prudential Ins.
Co., 29 S.W.3d at 77.
          To warrant submitting the Agency’s claim of tortious interference to the jury,
the evidence had to raise triable issues of fact on each of the following elements: (1)
the existence of a contract subject to interference, (2) a willful and intentional act of
interference with that contract, (3) which proximately caused damage to the Agency;
and (4) actual damage or loss. Butnaru v. Ford Motor Co., 84 S.W.3d 198, 207 (Tex.
2002). Even if a plaintiff has established all elements of a tortious-interference claim,
however, a defendant may nevertheless prevail by establishing that its conduct was
justified or privileged. See Prudential Ins. Co., 29 S.W.2d at 77-78. A defendant can
avoid liability by establishing this defense through evidence demonstrating that its
action with respect to the contract allegedly interfered with was premised on a legal
right. See id. at 78. In addition to claiming that the Agency made no preliminary
showing sufficient to defeat a motion for directed verdict on its claim that Allied
Signal tortiously interfered with the Agency’s sales agreements with the Tensor
parties, Allied Signal also asserted that its acquisition of the Tensor parties’ assets
was authorized by article 5.10(B)(2) of the Business Corporation Act and was
therefore justified. See Tex. Bus. Corp. Act Ann. art. 5.10(B)(2).
          The record reflects the trial court’s firm conviction that, in purchasing the
assets of the Tensor parties, Allied Signal was pursuing its legal right, guaranteed by
article 5.10(B)(2), to acquire only assets without incurring any liabilities of the
acquired entities unless Allied Signal expressly assumed those liabilities. To the trial
court, article 5.10(B)(2) created “a type of privilege” in Allied Signal that precluded
any claim by the Agency that Allied Signal tortiously interfered with the Agency’s
sales agreements with the Tensor parties in seeking to acquire only their assets. 
Accordingly, we assume, for purposes of argument only and without deciding that
issue, that the Agency made a preliminary showing of the elements necessary to
prevail on its tortious-interference claim and we address whether Allied Signal
sufficiently established its justification defense to warrant a directed verdict in its
favor.
          Article 5.10(B)(2) of the Business Corporation Act, set out in full above,
provides that a disposition of the assets of a corporation does not make the acquiring
entity “responsible or liable for any liability or obligation of the selling corporation”
that the acquiring entity “did not expressly assume.” Id. Well-settled law supports
the successor non-liability rule of asset acquisition. See Lockheed Martin Corp., 16
S.W.3d at 139-40; see also Shapolsky v. Brewton, 56 S.W.3d 120, 137-38 (Tex.
App.—Houston [14th Dist.] 2001, pet. denied) (applying non-liability rule in context
of holding that contacts of predecessor corporation with Texas forum could not be
attributed to successor to serve as basis for asserting personal jurisdiction). As
addressed above, even if the “continuity provisions” of the Agency’s sales and
marketing agreements with the Tensor parties purported to bind their “successors and
assigns,” those agreements could not contravene the protections that article
5.10(B)(2) afforded Allied Signal in acquiring the assets of the Tensor entities unless
Allied Signal expressly agreed to be bound by the Agency agreements. 
          The Agency disputes Allied Signal’s right to prevail on its justification defense
for two reasons. The Agency relies first on article 5.10(B)(2)’s exception to the non-liability rule for liabilities that the acquiring entity has expressly assumed. See Tex.
Bus. Corp. Act Ann. art. 5.10(B)(2). As addressed in our discussion of the
Agency’s first and second points of error, the APA excluded the Agency agreements
from the assets Allied Signal acquired, and Allied Signal assumed no liabilities under
those agreements except to the extent accrued or reserved for on the closing balance
sheet. 
          The Agency also disputes Allied Signal’s justification defense on the grounds
that the asset-purchase constituted a fraudulent transfer under UFTA. We rejected
the Agency’s reliance on both prongs of UFTA in overruling the Agency’s fifth point
of error, which challenged the trial court’s directing a verdict in favor of the Tensor
parties and Allied Signal on that claim. 
          From the authorities that the Agency relies on in support of this and other
issues, however, we discern the Agency’s contention that the asset-purchase was
fraudulent under UFTA because the successor, Allied Signal, was a “mere
continuation” of the Tensor parties. The Agency relies on Phippen v. Deere & Co.
965 S.W.2d 713 (Tex. App.—Texarkana 1998, no writ), and Griggs v. Capitol
Machine Works, Inc., 690 S.W.2d 287 (Tex. App.—Austin 1985), writ ref’d n.r.e. per
curiam, 701 S.W.2d 238 (Tex. 1985), to support these contentions. Phippen upheld
a successor corporation’s liability for a predecessor’s debts on the grounds that the
successor was a “mere continuation” of the predecessor. 965 S.W.2d at 726. Griggs
recognized the “mere continuation” theory as an exception to the rule of successor
non-liability. See 690 S.W.2d at 290 n.1. As addressed below, we decline to follow
Phippen and Griggs.
          In Lockheed Martin Corp., this Court explained that the legislature eliminated
the “mere continuation” theory as an exception to the rule of successor non-liability
in enacting article 5.10(B)(2) of the Business Corporation Act. See Lockheed Martin
Corp., 16 S.W.3d at 135 n.6; see also Shapolsky, 56 S.W.3d at 138-39 (same; citing
Lockheed Martin Corp.).


 We join the Shapolsky court in declining to consider
Phippen, on which the Agency relies, because article 5.10(B) effectively rejected the
precedent on which Phippen relies, specifically, Western Resources Life Ins. Co. v.
Gerhardt, 553 S.W.2d 783 (Tex. Civ. App.—Austin 1977, writ ref’d n.r.e.). See
Shapolsky, 56 S.W.3d at 137-38. For the same reason, we reject the Griggs court’s
suggestion that the “mere continuation” theory remains a viable exception to the rule
of successor non-liability. See 690 S.W.2d at 290 n.1 (citing Western Resources Life
Ins. Co.). 
          Accordingly, without expressing any opinion on whether the Agency
established the elements of its claim that Allied Signal tortiously interfered with the
Agency’s sales agreements with the Tensor parties, we hold that Allied Signal
established, as a matter of law, that its acquisition of the assets of the Tensor parties
was authorized by article 5.10(B)(2) of the Business Corporation Act and was
therefore justified. 
          We overrule the Agency’s fourth point of error. 
Quantum Meruit
          In its sixth point of error, the Agency contends that the trial court erred by
rendering summary judgment on the Agency’s quantum meruit claim and by refusing
to submit that issue to the jury as to Allied Signal.


 We address the Agency’s point
of error as a challenge to the trial court’s failure to submit the Agency’s quantum
meruit claim to the jury and apply the usual standard of review. See Tex. R. Civ. P.
278; Elbaor, 845 S.W.2d at 243; Exxon Corp., 842 S.W.2d at 631.
          To be entitled to submit a claim of quantum meruit to the jury, a plaintiff must
present more than a scintilla of evidence of the following elements: 
(1)that the plaintiff rendered valuable services or furnished
materials;
 
(2)that the services rendered or materials furnished were undertaken
for the person or entity sought to be charged; 
 
(3)and that the person or entity sought to be charged accepted and
enjoyed the services or materials; 
 
(4)under such circumstances as reasonably notified the person or
entity sought to be charged that the plaintiff, in performing the
services or providing the materials, expected to be paid by the
person or entity sought to be charged.

See Vortt Exploration Co. v. Chevron U.S.A., Inc., 787 S.W.2d 942, 944 (Tex. 1990). 
Quantum meruit is based on a promise implied by law to pay for beneficial services
rendered and knowingly accepted. Air Conditioning, Inc. v. L.E. Travis & Sons, Inc.,
578 S.W.2d 554, 556 (Tex. Civ. App.—Austin 1979, no writ).
          The Agency did not sufficiently substantiate at least the second and third
elements. The record does not show that the Agency rendered services “for” Allied
Signal or that Allied Signal accepted those services. Even if the Agency’s efforts
may have benefitted Allied Signal, proof of benefit is not legally sufficient to show
that the services were rendered “for” Allied Signal or that Allied Signal accepted the
services. See Bashara v. Baptist Mem. Hosp. Sys., 685 S.W.2d 307, 310 (Tex. 1985).
(Emphasis in original.) Despite any possible benefit to Allied Signal, the Agency has
not shown that any of the services that it claimed to have performed after the March
31, 1998 asset transfer were performed for Allied Signal or that Allied Signal
accepted those services. Because the Agency did not sufficiently demonstrate triable
issues of fact on the second and third elements, the Agency could not sufficiently
substantiate that the circumstances reasonably notified Allied Signal that the Agency
expected to be paid. Accordingly, the trial court did not err by refusing to submit the
Agency’s quantum-meruit claim against Allied Signal to the jury.
          We overrule the Agency’s sixth point of error. 
 Tensor Parties’ Challenge to Measure of Damages Submitted to Jury
          In their first issue, the Tensor parties contend that the trial court erred by
submitting question 2 of the charge. Question 2 was conditioned on the jury’s finding
that any of the Tensor parties failed to comply with the sales agreements with the
Agency and asked the jury to assess damages for “the following element of damages,
if any, and none other . . .[:] the amount of unpaid commissions, if any, for the time
period from July 20, 1994 through orders received by the Tensor parties on or before
March 31, 1998.” The Tensor parties contend that this instruction was error because
it authorized the jury to award damages based on sales for which the Tensor parties
never received payment. 
          A party must present its objections to the charge (1) to the trial court, either in
writing or by dictating them to the court reporter, (2) in the presence of the court and
opposing counsel, and (3) before the charge is read to the jury. Tex. R. Civ. P. 272. 
Objections not presented in this manner are waived. See id. To be sufficiently
specific, the party’s objection must identify the claimed error and explain the basis
of the party’s complaint. Tex. R. Civ. P. 274; Castleberry v. Branscum, 721 S.W.2d
270, 276 (Tex. 1986). A sufficiently specific objection enables the trial court to
understand the party’s precise grounds and to rule. Castleberry, 721 S.W.2d at 276. 
We determine whether a party has preserved error in the jury charge by inquiring
whether the party made the trial court aware of the complaint, timely and plainly, and
obtained a ruling. See State Dep’t of Highways & Pub. Transp. v. Payne, 838 S.W.2d
235, 241 (Tex.1992); see also Miga v. Jensen, 96 S.W.3d 207, 212-13 (Tex. 2002)
(upholding preservation based on Payne); Alaniz v. Jones & Neuse, Inc., 907 S.W.2d
450, 451-52 (Tex. 1995) (noting that Payne did not revise preservation requirements
of rules of civil procedure regarding jury charge, but did mandate that those
requirements be applied in common sense manner that serves, rather than defeats,
rules of procedure). As required by Payne, we review the record to determine
whether the Tensor parties made the trial court aware of their complaint that question
3 should never have been submitted to the jury and whether they obtained an adverse
ruling. See also Tex. R. App. P. 33.1(a) (general rules for preservation of error). 
          The Tensor parties contend that they preserved their challenge by objecting to
the charge, but the record indicates otherwise. The Tensor parties did not raise any
specific objections to the charge. Instead, they asserted a single, global adoption of
all of Allied Signal’s objections. Allied Signal, not the Tensor parties, objected to
submitting question 2 to the jury. Allied Signal’s objection, which the trial court
overruled, is as follows:
COUNSEL FOR ALLIED SIGNAL: . . . . Defendant Allied Signal
objects to Question Number 2 on damages. Under the sales agreements
that issue should – that instruction should inquire only as to invoices
paid to Tensor, QDT and/or QSI by its customers, so the instruction is
improper and we object on that basis.

This objection by Allied Signal followed two prior substantive objections and was
followed, in turn, by three additional substantive objections. The trial court
considered each of Allied Signal’s six objections individually and overruled each one
in turn. After the trial court overruled Allied Signal’s objections, the following
exchange occurred:
COUNSEL FOR THE TENSOR PARTIES: The Defendant[s] Tensor,
QDT[,] and QSI join[] those objections.
 
THE COURT: Really? I don’t know that you can do that. I’m not—
 
COUNSEL FOR THE TENSOR PARTIES: I was doing that in
connection with our—our earlier agreement.
 
THE COURT: Okay. All right. Okay. Pursuant to the earlier
agreement, overruled.

          As this excerpt reflects, the Tensor parties’ response to the trial court merely
referred to a prior agreement without disclosing the substance of that agreement. 
Although the trial court overruled the Tensor parties’ massed, adopted objection, the
record suggests that the trial court’s ruling was premised on the court’s having been
made to understand that an agreement concerning charge objections had occurred. 
The record before us, however, does not reflect any agreement of that type. 
          The record does include a signed order granting Allied Signal’s motion that
objections by Allied Signal would suffice to preserve error asserted by the Tensor
parties, and vice versa, but that order encompassed only evidentiary objections.


 In
contending that this stipulation nevertheless sufficed, the Tensor parties rely on
Operation Rescue-National v. Planned Parenthood, 937 S.W.2d 60 (Tex.
App.—Houston [14th Dist.] 1996), aff’d as modified on other grounds, 975 S.W.2d
546 (Tex. 1998), in which a stipulation, that one defendant’s objections applied to all,
was held adequate to encompass objections to the jury charge. Id. at 71. Although
we may surmise that the stipulation in Operation Rescue National was not limited to
evidentiary objections and was thus less narrowly drawn than the stipulation by
Allied Signal and the Tensor parties here, the opinion of our sister court does not
reveal the contents of the defendants’ stipulation. See id. Because the agreement
claimed here clearly falls far short of encompassing objections to the charge, we
decline the Tensor parties’ request to apply Operation Rescue National’s
preservation-by-adoption rule to this case. We further conclude that the Tensor
parties may not rely on the trial court’s having authorized the Tensor parties and
Allied Signal to agree that the evidentiary objections of either would preserve error
as to the other party. Accordingly, we reject the Tensor parties’ reliance on the
sufficiency of that agreement as having preserved any error in the charge.
          The question thus becomes whether, by merely “joining” all of Allied Signal’s
objections, the Tensor parties (1) made the trial court sufficiently aware of their
complaint that question 2 should never have been submitted to the jury and (2)
obtained an adverse ruling on that complaint. See Payne, 838 S.W.2d at 241. We
conclude that they did not. 
          Rule 274, which governs objections to the jury charge, places responsibility on
individual parties and thus contemplates action by individual parties. See Tex. R.
Civ. P. 274 (“A party objecting to a charge . . .”; “ [w]hen the complaining party’s
objection . . . .”) (Emphasis added.)


 As addressed above, rule 274 also requires
distinct, specific objections that timely and plainly make the trial court aware of the
complaint. See id.; Payne, 838 S.W.2d at 241. Consistent with imposing
responsibility on each party and with requiring clear and specific objections by each
party, rule 274 provides that, “No objection to one part of the charge may be adopted
and applied to any other part of the charge by reference only.” See Tex. R. Civ. P.
274; see C.T.W. v. B.C.G., 809 S.W.2d 788, 793 (Tex. App.—Beaumont 1991, no
writ); Washburn v. Krenek, 684 S.W.2d 187, 190 (Tex. App—Houston [14th Dist.]
1984, writ ref’d n.r.e.). 
          Rule 274’s prohibition against adopting by reference has generally been
interpreted as prohibiting one party from incorporating by reference its own
objections to another portion of the charge. See C.T.W., 809 S.W.2d at 793;
Washburn, 684 S.W.2d at 190. Yet, nothing in the rule limits its application to that
context. See Tex. R. Civ. P. 274. In Wright Way Construction Co. v. Harlingen Mall
Co., the Corpus Christi Court of Appeals unhesitatingly relied on rule 274’s
prohibition against adopting prior objections and held that one of two appellants in
a multi-party case had not preserved error. 799 S.W.2d 415, 420-21 (Tex.
App.—Corpus Christi 1990, writ denied). Like the Tensor parties here, the party
claiming error on appeal had merely adopted a codefendant’s objections. See id.           A recognized commentator on the court’s charge has noted the following
observation concerning the rationale that underlies rule 274’s prohibition against
adopting prior objections:
 The trial judge should not be required to recall arguments made earlier
in the charge conference in determining whether a party has met the
burden of clearly and distinctly setting forth objections and grounds. 
The goal of [r]ule 274 is to give all participants, including the trial judge
and the appellate courts, an opportunity to know with certainty that all
objections have been made at the designated point in the proceedings. 
Adoption of objections by reference does not advance the purposes of
[r]ule 274. 

Charles R. “Skip” Watson, Jr., The Court’s Charge to the Jury, in State Bar of
Tex., Prof. Dev. Program, Advanced Civil Trial Course 7, 7-28 (2003). 
          Well-settled law holds that a trial court properly overrules an objection that
neither specifies the charge error complained of nor the grounds for the complaint. 
 See Castleberry, 721 S.W.2d at 276-77. Objections that are not sufficiently specific
do not preserve error. Id. The Tensor parties’ attempt to challenge the trial court’s
submitting question 2 of the charge simply by asserting a global adoption of Allied
Signal’s six objections was neither specific nor stated the grounds for the complaint. 
Accordingly, the Tensor parties contravened rule 274 by not making the trial court
aware, timely and plainly, of the Tensor parties’ specific complaint concerning
question 2. See Payne, 838 S.W.2d at 241; see also Alaniz, 907 S.W.2d at 451- 452. 
          We conclude that the record does not reflect that the trial court endorsed an
agreement that objections by either Allied Signal or the Tensor parties sufficed to
preserve error beyond evidentiary complaints. Accordingly, that agreement did not
encompass objections to the charge. We further conclude, as the trial court surmised,
that the Tensor parties did not preserve any error premised on erroneously submitting
question 2 to the jury merely by “joining” the six substantive objections lodged by
Allied Signal. Instead, the Tensor parties were required to present their own
objections. We further conclude that the Tensor parties neither met that requirement
nor obtained an adverse ruling. See Wright Way Constr. Co., 799 S.W.2d at 421;
Tex. R. Civ. P. 274; Tex. R. App. P. 33.1(a). Accordingly, we hold that the Tensor
parties did not timely present to the trial court the legal contention on which they
premise their third issue, specifically, that question 2 should not have been submitted
to the jury. 
          We overrule the Tensor parties’ first issue. 
Tensor Parties’ Challenge to Damages
          The Tensor parties’ second issue presents an alternative challenge concerning
the damages awarded by the jury. In this issue, the Tensor parties contend that the
damages are excessive and based on factually insufficient evidence and ask that we
reform the trial court’s judgment by “ordering” a remittitur for a lesser amount.


          Questions of the excessiveness of actual damages and requests for remittitur
present challenges to the factual sufficiency of the evidence. Maritime Overseas
Corp., 971 S.W.2d at 406; Carter v. Steverson & Co., 106 S.W.3d 161, 168 (Tex.
App.—Houston [1st Dist.] 2003, pet. denied); Hawthorne v. Guenther, 917 S.W.2d
924, 937 (Tex. App.—Beaumont 1996, writ denied). Because the remedy sought by
a factual-sufficiency challenge is a new trial, factual-sufficiency complaints must be
preserved by a motion seeking that relief. Tex. R. Civ. P. 324(b)(4); McDade v. Tex.
Commerce Bank, 822 S.W.2d 713, 721 (Tex. App.—Houston [1st Dist.] 1991, writ
denied). A request for relief by remittitur must, therefore, be preserved in the trial
court by a motion that seeks remittitur, whether filed independently or as part of a
motion for new trial. See Hawthorne, 917 S.W.2d at 937.
A.      Remittitur
          The Tensor parties filed a motion for new trial, in which they argued that the
award of damages was excessive, but did not request a remittitur in that motion or by
a separate motion seeking remittitur. Instead, they sought remittitur in their motion
for judgment notwithstanding the verdict. Although they acknowledge that their
issue presents a factual-sufficiency challenge, the Tensor parties contend that they
preserved their request for reformation of the trial-court judgment through their
motion for judgment notwithstanding the verdict. 
          Consistent with rule 301, which governs motions for judgment notwithstanding
the verdict, the Tensor parties’ rule 301 motion sought relief by rendition only—not
a new trial. See Tex. R. Civ. P. 301. By including their request for a remittutur
within their motion for judgment notwithstanding the verdict, the Tensor parties
essentially requested that the trial court modify its judgment on the grounds that the
damages awarded exceeded the evidence as a matter of law. See Landmark Am. Ins.
Co. v. Pulse Ambulance Serv., Inc., 813 S.W.2d 497, 499 (Tex. 1991); Tex. R. Civ.
P. 329b(g) (governing motions to modify, correct, or reform the judgment). 
          Moreover, the amount requested for rendition in the trial court, $211,164.97,
differs from the $547,446.91 amount that the Tensor parties propose that we suggest
as remittitur here. A party preserves no error for an appellate complaint that enlarges
the complaint presented to the trial court because the trial court has not had the
opportunity to rule on the enlarged complaint. See In re C.O. S., 64 S.W.2d 988, 765
(Tex. 1999) (citing and quoting from Pirtle v. Gregory, 629 S.W.2d 919, 920 (Tex.
1982)); Tex. R. App. P. 33.1(a)(1)(A). 
          Given these procedural circumstances, we conclude that the Tensor parties’
motion for judgment notwithstanding the verdict did not preserve any “matter of law”
points challenging the trial court’s refusal to suggest remittitur, either in the amount
proposed to the trial court or to this Court. Accordingly, we confine our analysis to
considering whether factually sufficient evidence supports the $906,793.90 awarded
as actual damages. 
B.      Excessiveness Challenge
          The Tensor parties preserved their factual-sufficiency challenge to the
excessiveness of the damages awarded in their motion for new trial. We review
excessive-damages complaints as challenges to the factual sufficiency of the evidence
to support the damage award and apply the same test for determining any factual-sufficiency challenge. See Maritime Overseas Corp., 971 S.W.2d at 406. We
consider and weigh all the evidence and may set aside the verdict only if it so
contrary to the overwhelming weight of the evidence that the verdict is clearly wrong
and unjust. Id. at 407. In considering and weighing the evidence, however, we must
defer to the factfinder as final determiner of the credibility of witnesses and the
weight to give their testimony. Id. If we conclude that the evidence is factually
insufficient and that the award of damages is, therefore, excessive, we must detail
why we reach that result. Id. In that instance, this Court may suggest a remittitur. 
Id.
          The Tensor parties focus their challenge on their contention that the jury
“obviously” considered only Plaintiff’s Exhibit 30 in awarding the Agency
$906,793.90 for “the amount of unpaid commissions, if any, for the time period from
July 20, 1994 through orders received by the Tensor parties on or before March 31,
1998,” in response to question 2 of the charge. Exhibit 30 consists of a single-page
chart, prepared by the Agency, that summarizes the 87 pages of supporting data,
which also comprise Exhibit 30, and indicated the Agency’s interpretation of that
data as to the total amount of commissions due for certain periods. It is undisputed
that the underlying data were Tensor records that pertained to the Agency’s sales and
were produced to the Agency through discovery. 
          We note that the record reflects that the Agency did not keep the most accurate 
records, or even good records. Asfahl worked without an assistant and refused to hire
an assistant when the Tensor parties suggested that he do so. The Agency relied on
the Tensor parties’ bookkeeping, and had to rely on their producing that bookkeeping
in response to discovery to a significant degree in calculating proposed damages. The
record further reflects ongoing controversy among the parties concerning whether
commissions were due to the Agency and a resulting protracted discovery process
that continued up to and including trial.
          The Tensor parties contend that the totals shown on the summary page of
Exhibit 30 did not exclude either commissions not covered by the Agency’s sales
agreements, sales to customers not included in the agreements, or amounts already
paid. The Tensor parties argue that other data compilations they produced to the
Agency, specifically, Exhibits 29 and 33, encompassed those exclusions.


 The
Tensor parties contend that the total damages due to the Agency after taking those
exclusions into consideration is not $906,793.90, but $567,446.91. 
          The Tensor parties’ argument ignores that the evidence comprised not only
Exhibits 29, 30, and 33, but many other exhibits as well as the testimony of Asfahl
and Tensor principals and employees. Asfahl’s testimony included his assertions that
he was personally familiar with all invoices and the sales register supporting the
Agency’s claimed damages. Tensor’s testimony included admissions that the Tensor
parties’ calculations contained mistakes and other statements that the Agency had
been paid all sums due in full as of the date of trial. It was the role of the jury to
reconcile these conflicts as well as to assess the credibility of the witnesses in arriving
at its verdict. See Maritime Overseas Corp., 971 S.W.2d at 407. That the jury
apparently agreed with the Agency’s calculation does not mean that the jury did not
consider and reconcile all the evidence in arriving at that agreement. See id. 
          Having reviewed the evidence, we cannot say that the jury’s awarding the
Agency $906,793.90 in actual damages was clearly wrong and manifestly unjust and
therefore hold that factually sufficient evidence supports the award.
          We overrule the Tensor parties’ second issue.
Tensor Parties’ Challenge to Admissibility of the Agency’s Exhibit 30
          The Tensor parties’ fourth issue challenges the trial court’s admitting the
Agency’s damages summary, Exhibit 30, over their and Allied Signal’s objection.


 
In reviewing the trial court’s decision to admit Exhibit 30, we determine whether the
trial court abused its discretion by ruling without regard for any guiding rules and
principles. See Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex.
1998). If the record discloses a legitimate basis for the evidentiary ruling, we must
uphold the ruling. See id. In addition, we may not reverse an evidentiary ruling
unless the error probably caused the rendition of an improper judgment. See id.; Tex.
R. App. P. 44.1(a). 
          As explained above, Exhibit 30 comprises a chart, prepared by Asfahl on
behalf of the Agency, that summarized 87 underlying documents produced to the
Agency through discovery. The summary identified amounts owed and by which of
the Tensor entities, broken down further by the rate of commission due, as well as
“Bates”-stamp references to the supporting documents. The summary also identified
several, specific time periods that corresponded to the cutoff date for limitations, the
date of the asset-purchase, and other dates. After the trial court directed a verdict that
the Agency was not entitled to future commissions under the APA, the pertinent time
periods became the following: pre-July 20, 1994 (the start date for limitations) and
post-July 20, 1994 until March 31, 1998 (the date of the asset-purchase agreement).


 
For the post-July 20, 1994 time period, the total amount listed as owed was
$906,793.90. This was the amount that the jury awarded as actual damages. 
          The first trial objection to Exhibit 30 urged surprise and delay. In overruling
this objection, the trial court noted, for the record, that the parties had been engaged
in significant, ongoing controversy over the admissibility of a summary and that the
trial court had resolved that controversy by deciding that a summary was appropriate. 
Asfahl then testified that he was “personally familiar with every entry” and had
“reviewed all of the underlying documentation upon which [the] data had been
derived,” which was present in the courtroom. When the Agency’s counsel offered
Exhibit 30 into evidence, a new objection was made. This objection challenged
Asfahl’s qualifications to prepare the summary. When the Agency’s counsel replied,
“This is a calculation of his damages based on looking at the invoices and looking at
the checks and seeing that he hadn’t been paid,” the trial court interjected, “but it’s
just math.” The objection was pursued, however, on the grounds that, “There has to
be a decision as to whether or not he was entitled to be paid.”


 But the trial court
again interjected, “Give me something more specific . . . I mean, if it’s just his
compilation of the invoices and adding them up,” which produced the following
response: “I think that’s what it is.” After that exchange, the trial court admitted
Exhibit 30. 
          Rule 1006 of the Rules of Evidence imposes three requirements for the
admissibility of summaries of records that “cannot conveniently be examined in
court,” as follows: the underlying records are (1) voluminous; (2) have been made
available to the opponent for inspection; and (3) the underlying records are
admissible. Tex. R. Evid. 1006. At 87 pages, the underlying data is voluminous. 
The second and third requirements are readily met because it is undisputed that the
underlying data are Tensor records that were in the courtroom during trial, produced
to the Agency by the Tensor parties through the discovery process and therefore
admissible, at least as non-hearsay admissions of a party-opponent. See Tex. R. Evid.
801(e)(2). Concerning Asfahl’s qualifications to prepare the exhibit, the record
contains his testimony that he was personally familiar with all the documents that
provided the underlying data for Exhibit 30. See Tex. R. Evid. 602. There was no
objection to this testimony or to Asfahl’s testimony that the summary reflected
commissions the Agency was owed. 
          As in their second issue, the contention that lies at the core of the Tensor
parties’ challenge to Exhibit 30 on appeal is their insistence that the jury necessarily
relied on the exhibit in awarding the Agency $906,793.90. As addressed above, the
record does not compel that conclusion. Moreover, the record provides independent
support, beyond Exhibit 30, for the Agency’s claim of $906,793.90, through Asfahl’s 
own testimony, to which neither the Tensor parties nor Allied Signal objected. In
addition, the Tensor parties contended, at a bench conference concerning the
admissibility of a different exhibit, that the exhibit under discussion was “totally
cumulative” of Exhibit 30. No error arises from admitting evidence that is cumulative
of other, properly admitted evidence. See Owens-Corning Fiberglas Corp., 916
S.W.2d at 561. 
          The circumstances of this case differ, therefore, from City of Dallas v. GTE
Southwest, Inc., 980 S.W.2d 928, 935 (Tex. App.—Fort Worth 1998, pet. denied), in
which the court rejected the attempt by a proponent of a summary to circumvent a
trial-court deadline for designation of expert witnesses. The underlying documents
were not in evidence and therefore not before the court, as here, and the witness
presented to offer the summary could not, as here, vouch for the underlying data. Id. 
Also distinguishable is Baylor Medical Plaza Services v. Kidd, 834 S.W.2d 69 (Tex.
App.—Texarkana 1992, writ denied). In that case, the proponent of a summary could
testify only that the bills underlying the summary were represented to that witness as
bills incurred by the plaintiff, but there was no testimony to establish that fact. Id. at
77. Here, the Agency used Tensor documents and established Asfahl’s personal
knowledge of those documents, as obtained from the Tensor parties. 
          We hold that the trial court did not abuse its discretion by admitting Plaintiff’s
Exhibit 30 and overrule the Tensor parties’ fourth issue. 
Tensor Parties’ Challenge to Attorney’s Fees Awarded
          The Tensor parties’ fifth and sixth issues challenge the attorney’s fees awarded
in the judgment. 
 

A.      Failure to Segregate
          In their fifth issue, the Tensor parties contend that the award of attorney’s fees
must be reversed for failure to segregate. The Tensor parties’ challenge is premised,
however, on their contention that the trial court erred by submitting question 4 of the
jury charge. They argue that this Court must remand this cause because question 4
asked only, “What is a reasonable fee for the necessary services of Charles Asfahl’s
attorneys in this case?” and did not require the jury to segregate between fees
allocable to contract claims from those related to other claims for which attorney’s
fees are not recoverable. 
          Attorney’s fees are recoverable only for authorized claims. Green Int’l, Inc.
v. Solis, 951 S.W.2d 384, 389 (Tex. 1997). The Tensor parties acknowledge the
Agency’s entitlement to attorney’s fees on its breach of contract claim, see Tex. Civ.
Prac. & Rem. Code Ann. § 38.001(8) (Vernon 1997), and correctly contend that
attorney’s fees are not recoverable for the tort claims that the Agency asserted and on
which it did not prevail. See, e.g., City of Garland v. Dallas Morning News, 22
S.W.3d 351, 367 (Tex. 2000); AU Pharm., Inc. v. Boston, 986 S.W.2d 331, 337 (Tex.
App.—Texarkana 1999, no pet.) (noting that attorney’s fees are not recoverable for
tort claims). When a party’s claims include causes of action for which attorney’s fees
are recoverable and other claims for which attorney’s fees are not recoverable, the
party must offer proof that segregates between recoverable and nonrecoverable
claims. Green Int’l, Inc., 951 S.W.2d at 389; Hruska v. First State Bank, 747 S.W.2d
783, 785 (Tex. 1988); Paramount Nat’l Life Ins. Co. v. Williams, 772 S.W.2d 255,
266 (Tex. App.—Houston [14th Dist.] 1989, writ denied). An exception applies
when claims arise out of the same transaction and are “so interrelated that prosecuting
them entails proof or denial of essentially the same facts.” Stewart Title Guar. Co.
v. Aiello, 941 S.W.2d 68, 73 (Tex. 1997); see Paramount Nat’l Life Ins. Co., 772
S.W.2d at 266. 
          When segregation is proper, as the Tensor parties contend here in response to
the Agency’s contention that the exception applies, the jury not only determines the
amount of attorney’s fees, but also determines the segregation issue. See Green Int’l,
Inc., 951 S.W.2d at 389; Hruska, 747 S.W.2d at 785; Paramount Nat’l Life Ins. Co.,
772 S.W.2d at 266. Accordingly, the party seeking segregation waives error when
that party does not object to the attorney’s fees question in the jury charge on the
ground that it does not provide for segregation of any fees the jury might award
among recoverable and non recoverable claims.


 Hruska, 747 S.W.2d at 784-85;
Paramount Nat’l Life Ins. Co., 772 S.W.2d at 266
          The record reflects that only Allied Signal, and not the Tensor parties, objected
to the attorney’s fees question on the grounds of failure to segregate. In contending
that they preserved their complaint, the Tensor parties again rely on their attempted
adoption of Allied Signal’s objections to the charge. For the same reasons stated in
overruling the Tensor parties’ first issue, we reject their claim that they preserved
error here. Because the record thus reflects no objection by the Tensor parties, they
have waived any error in the trial court’s submitting the attorney’s fees question to
the jury without also requiring the jury to segregate. 
          We overrule the Tensor parties’ fifth issue.
B.      Excessiveness
          In their sixth issue, the Tensor parties contend that the jury’s award of over
$1.3 million in attorney’s fees is excessive and request that we suggest a remittitur
for a specific, lesser amount. An attorney’s fee award may be challenged for the
sufficiency of the evidence to support the award. Stewart Title Guar. Co. v. Sterling,
822 S.W.2d 1, 12 (Tex. 1991). We address the Tensor parties’ issue as raising a
factual-sufficiency challenge and apply the well-settled standard of review that
governs those challenges.


 E.g., Maritime Overseas Corp., 971 S.W.2d at 406. 
          A “short hand” version of other factors that may properly be considered in
awarding attorney’s fees is that the fees must be “reasonable and necessary.” See
Sterling, 822 S.W.2d at 10. The reasonableness of attorney’s fees is a question of
fact. See Ragsdale v. Progressive Voters League, 801 S.W.2d 880, 882 (Tex. 1990). 
We note further that, in reviewing an attorney’s fee award for excessiveness, we may
draw upon our common knowledge as justices of the court and our experience as
lawyers and judges. See Aquila Southwest Pipeline, Inc. v. Harmony Exploration,
Inc., 48 S.W.3d 225, 241 (Tex. App.—San Antonio 2001, pet. denied). Factors that
we consider in determining whether attorney’s fees are reasonable include the
following:
(1)the time and labor required, the novelty and difficulty of the
questions involved, and the skill required to perform the legal
service properly;
 
(2)the likelihood . . . that the acceptance of the particular
employment will preclude other employment by the lawyer;
 
(3)the fee customarily charged in the locality for similar legal
services;
 
(4)the amount involved and the results obtained;
 
(5)the time limitations imposed by the client or by the
circumstances;
 
(6)the nature and length of the professional relationship with the
client;
 
(7)the experience, reputation, and ability of the lawyer or lawyers
performing the services; and
 
(8)whether the fee is fixed or contingent on results obtained or
uncertainty of collection before the legal services have been
rendered.

Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex. 1997)
(quoting Tex. Disciplinary R. Prof. Conduct 1.04, reprinted in Tex. Gov’t Code 
tit. 2, subtit. G app. (State Bar Rules, art. X, § 9)). We must be mindful, however,
that we are reviewing a jury’s verdict and may not substitute our judgment for that of
the factfinder. E.g., Maritime Overseas Corp., 971 S.W.2d at 406. 
          The Agency’s trial counsel and an independently retained attorney offered
expert-witness testimony in support of the attorney’s fees that the Agency requested. 
Both attorneys attested to the magnitude and complexity of the case and described a
protracted discovery process that produced 93,000 documents and continued until the
trial date. In addition, both attorneys noted that the case was vigorously contested
and defended by both Allied Signal and the Tensor parties. The Agency’s retained
expert indicated that he had reviewed the Agency’s billing records and found them
reasonable, given the complexity of the case. The billing records were admitted into
evidence without objection. In the opinion of the expert, the Agency’s retained
counsel’s $185.00 per hour billing rate was below the market rate, and the fair market
value of the Agency’s counsel’s services was $250.00 per hour, given the firm’s
expertise and experience. After applying that rate to the 3,623.85 hours billed, the
expert arrived at the $1,328,922.00 figure that the jury awarded. The Agency’s trial
counsel agreed that the amount suggested was reasonable. 
          The Tensor parties’ chief complaint in challenging the award as excessive is
that it does not bear a reasonable relationship to the damages awarded. See Musgrave
v. Brookhaven Lake Prop. Owners Ass’n, 990 S.W.2d 386, 403 (Tex.
App.—Texarkana 1999, pet. denied). But the amount of damages awarded is not the
sole determining factor, especially when we consider the complexity of this case. See
Rio Grande Valley Gas Co. v. City of Edinburg, 59 S.W.3d 199, 224 (Tex.
App.—Corpus Christi 2000, no pet.) (affirming award of attorney’s fees awarded for
trial that exceeded three times the amount of actual damages on grounds of
complexity of issues raised). We also reject the Tensor parties’ contention that the
award exceeds the amount that Asfahl agreed to pay his attorneys. Although Asfahl
had initially agreed to pay his attorneys $185 to $195 per hour, an amount that the
Agency’s expert disputed as adequately reasonable, given the attorney’s experience
and expertise, that agreement was changed to an alternative, contingency agreement
for a reduced hourly rate combined with an agreed percentage for any recovery. 
          Having reviewed the Tensor parties’ challenge and the evidence that the
Agency offered to support the jury award, we cannot say that the evidence that
supports the award of attorney’s fees is so weak that the award is clearly wrong and
manifestly unjust. See Maritime Overseas Corp., 971 S.W.2d at 406-07. In addition,
after having reviewed the record based on the Arthur Anderson & Co. v. Perry factors
and having also drawn upon our common knowledge and experience as lawyers and
judges, we likewise cannot say that the evidence the Agency offered fails to show that
the jury’s award was reasonable and necessary. See Arthur Anderson Co., 945
S.W.2d at 818; Sterling, 822 S.W.2d at 10; Aquila Southwest Pipeline, 48 S.W.3d at
241. Accordingly, we hold that the jury’s award was not excessive. 
          We overrule the Agency’s sixth point of error.
Conclusion
          We reverse that portion of the judgment of the trial court that awards the 
Agency the sum of $518,686.10, to be recovered from the Tensor parties, jointly and
severally, as a result of trebling pursuant to section 35.84 of TSRA and render
judgment that the Agency take nothing on its claims pursuant to section 35.84 of
TSRA. We affirm the judgment of the trial court in all other respects. 
 
 
 
 
                                                             Elsa Alcala
                                                             Justice

Panel consists of Justices Taft, Jennings, and Alcala.